## IN THE CIRCUIT COURT OF HARRISON COUNTY, MISSISSIPPI
## SECOND JUDICIAL DISTRICT

Harrison County Utility Authority )
)
    Plaintiff, )
)
    v. )   Civil Action No. A2402 - 15 - 177
)
N-Y Associates, Inc., )
)
    Defendants. )
_____ )

### SUMMONS

THE STATE OF MISSISSIPPI

TO:   Any Sheriff or person authorized by law

    You are hereby commanded to serve this Summons and a copy of the Complaint in this action upon:

    **N-Y Associates, Inc.,**
    **Frank Nicoladis, its registered agent for service of process,**
    **178 Main Street**
    **Biloxi, Mississippi 39530,**

    or wherever he may be found.

(A) promptly locating the said Defendant and handing to him a copy of this Summons and Complaint, or (B) in the event you are unable to so proceed because the Defendant cannot be found by leaving a copy of the Summons and Complaint at the Defendant's usual place of abode with his/her spouse or some other person of the Defendant's family above the age of sixteen years of age and who is willing to receive same, or (C) by such other means by law.

### NOTICE TO DEFENDANT
### THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS

    You are required to mail or hand-deliver a copy of a written Answer either admitting or denying each allegation in the Complaint to T. Russell Nobile, attorney for the Plaintiff, WISE CARTER CHILD & CARAWAY, P.A., 1105 30th Avenue, Suite 300, Gulfport, Mississippi 39501. This answer must be mailed or delivered within 30 days from the date of delivery of this summons, or a judgment by default may be entered against you for the money or other things demanded in the Complaint.



You must also file the original of your Answer with the Clerk of the Circuit Court within a reasonable time afterward.   Not to exceed thirty (30) days from the date of service of writ.

So certified this the _____ day of December, 2015.

(SEAL)

Hon. Gayle Parker, Circuit Court Clerk

By: _____, D.C.

**IN THE CIRCUIT COURT OF HARRISON COUNTY, MISSISSIPPI**
**SECOND JUDICIAL DISTRICT**

FILED

DEC 0 4 2015

GAYLE PARKER
CIRCUIT CLERK
BY:_____ .D.C.

| | | |
|---|---|---|
| Harrison County Utility Authority | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. *A2402 -15-177* |
| | ) | |
| N-Y Associates, Inc., | ) | **DEMAND FOR** |
| | ) | **JURY TRIAL** |
| Defendants. | ) | |
| | ) | |

## COMPLAINT

Plaintiff Harrison County Utility Authority ("HCUA") brings this civil action and alleges as follows:

### JURISDICTION AND VENUE

1.      The Circuit Court for Harrison County, Mississippi is the proper venue for this action.   Miss. Code Ann. § 11-1-3.

2.      This Court has jurisdiction over this matter Miss. Code Ann. § 9-7-81.

### PARTIES

3.      Plaintiff HCUA is a political subdivision of the State of Mississippi and is located in Harrison County.   The HCUA is organized pursuant to the Mississippi Gulf Coast Region Utility Act of 2006, Miss. Code Ann. § 49-17-701 et seq.   The HCUA is authorized to proceed in this action.

4.      Defendant N-Y Associates, Inc., ("NY") is a corporation created under the laws of the State of Louisiana and principally located in 2750 Lake Villa Drive, Metairie, Louisiana 70002.   NY has a Mississippi office located at 178 Main Street, Biloxi, Mississippi 39530.   It

1

may be served via its registered agent, Frank Nicoladis, at that same address in Biloxi.

## ALLEGATIONS

5.     NY is a private firm that, among other things, provides civil and structural engineering services.  Such services include planning, design, and construction management services for water and wastewater systems.

6.     Following Hurricane Katrina, the HCUA was a sub-recipient of several community development block grants ("CDBG") from the U.S. Department of Housing and Urban Development.  The HCUA used these grants to design and construct numerous water and wastewater utility improvements throughout Harrison County.

7.     The Biloxi Broadwater Water System Improvements, Project W-19 ("W-19"), was one such project funded by the CDBG funds.

8.     The HCUA contracted with NY on June 4, 2007 to serve as the local professional engineer overseeing the conceptual design of an elevated water storage system in Biloxi, Mississippi that included, among other improvements, the construction of a water tower.  *See Exhibit 1, June 4, 2007 Contract Between the HCUA and NY.*

9.     Near the completion of the conceptual phase of the project, the HCUA contracted with NY to provide final design engineering services on W19.  *See Exhibit 2, May 1, 2008 Contract Between the HCUA and NY* ("design contract").

10.     Among its other responsibilities, NY was the local engineer responsible for field reconnaissance and other due diligence expected of a professional engineer during the conceptual, design, and construction phases of the project.

11.     Relevant here, such responsibilities required NY to inspect and evaluate the site where the water tower was to be constructed to determine whether the site was suitable or ap-

2

propriate and notify the HCUA and the project team of any reason why the site was not be suitable for the project or otherwise required additional analysis or rehabilitation in order for it to be a suitable site.

12.     In Amendment No. 3 to the design contract, the HCUA and NY agreed to expand NY's scope of work on the project to add handling the bid phase and construction administration of the project, including the appointment of a resident project representative ("RPR").[1]  *See Exhibit 3, Amendment No. 3 to May 1, 2008 Contract Between the HCUA and NY, October 1, 2009.*

13.     In October 2009, based on NY's work, the HCUA purchased the real property location for the site.

14.     In December 2009, the HCUA authorized the water tower contractor to begin out-of-state fabrication of W19's water tower.

15.     Subsequent to the purchase and the authorization to begin fabrication, it was discovered by other members of the project team that there existed possible environmental and physical barriers making the site where the water tower was designed to be constructed unsuitable.

16.     Based on this discovery, the HCUA and the project team conducted further due diligence on the site.

17.     After conducting further due diligence, the HCUA determined that it needed to consider alternative sites and, possibly, redirect other portions of the project, e.g., water lines and "tie-ins."  The HCUA had to suspend or delay work, reevaluate the project, and conduct sub-

---

[1]     The final design services contract was amended six times before NY's work on the project was terminated in March 2014.

3

stantial additional site analysis.

18.     This resulted in material delays to the project.  Those initial delays led to other delays further increasing the cost of the project, especially with respect to costs related to the fabrication, maintenance, and construction of the water tower.

19.     These delays lead to approximately $700,000 in additional expenses on the project.

20.     The HCUA has been advised that it will not be reimbursed under the CDBG grant program for these additional costs.

21.     NY failed to meet its contractual and professional responsibilities with respect to W19.  Among other failures, NY failed to properly evaluate and inspect the water tower site as required under the contract and as would be reasonably expected of a professional engineer.

**Count 1**
**Breach of Contract**

22.     All the facts and allegations listed above are hereby incorporated by reference.

23.     Pursuant to the conceptual and design contracts, NY had numerous duties.   Among others, NY had a duty to:

> A.     Design the project within the standard of care of the industry;
>
> B.     Prepare plan designs and specifications that the HCUA and the project team could rely upon during the course of the project;
>
> C.     To conduct the contractually-required field reconnaissance;
>
> D.     To properly select, evaluate, and scrutinize the site where the water tower was designed to be located;
>
> E.     To timely identify and analyze design-related and other project problems;
>
> F.     To timely provide proposed solutions and remedies the any design-related

4

and other project problems;

  G.  Provide construction administration services as required;

24. NY breached its contractual obligations.

**Count 2**
**Professional Negligence**

25. All the facts and allegations listed above are hereby incorporated by reference.

26. NY had a duty exercise the ordinary professional skill and diligence expected of engineers and design professionals. *Family Dollar Stores of Mississippi, Inc. v. Montgomery*, 946 So. 2d 426, 430 (Miss. Ct. App. 2006); *U.R.S. Co. v. Gulfport-Biloxi Reg'l Airport Auth.*, 544 So. 2d 824, 827 (Miss. 1989); *Dickerson Co., Inc. v. Process Engineering Co.*, 341 So.2d 646 (Miss.1977)).

27. As a licensed professional engineer, NY had a duty to:

  A.  Design the water tower project in accordance with applicable codes and law and within the standard of care of the industry;

  B.  Conduct field reconnaissance, to evaluate and inspect the water tower site location;

  C.  To timely identify and analyze design-related and other project problems;

  D.  To timely provide proposed solutions and remedies the any design-related and other project problems.

  E.  Professionally and objectively carry out its obligations and responsibilities.

28. NY breached its duty to prepare adequate and accurate drawings from which the HCUA and the other contractors could properly construct the water tower.

29. As a direct and proximate result of NY's breaches of its professional obligations,

5

HCUA was damaged in excess of $700,000, the exact amount to be proven at trial.

### Count 3
### Breach of Expressed or Implied Warranties

30.     All the facts and allegations listed above are hereby incorporated by reference.

31.     NY warranted that it would perform services under the contract in manner consistent with that level of care and skill ordinarily exercised by members of professional engineers practicing along the Gulf Coast.

32.     NY breached its warranty to the HCUA by failing to exercise due care and by failing to exercise the professional standard of care

33.     As a direct and proximate result of NY's warranty breaches, HCUA was damaged in excess of $700,000, the exact amount to be proven at trial.

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiff HCUA prays for the following relief:

    A. A trial by jury;

    B. Any and all declaratory relief necessary;

    C. Compensatory damages in the amount of $800,000, or an amount to be proven at trial;

    D. All legal and equitable remedies allowed, including but not limited to, rescission, indemnification,

    E. Liquidated and Consequential Damages;

    F. Prejudgment and post-judgment interest;

    G. All costs, including attorneys' fees.

Respectfully submitted, on this the 4th day of December, 2015

**Harrison County Utility Authority**

By their attorney,

T. Russell Nobile (MS Bar No. 100682)
WISE CARTER CHILD & CARAWAY, P.A.
1105 30th Avenue, Suite 300
Gulfport, Mississippi 39501
(228) 867-7141
trn@wisecarter.com
jcs@wisecarter.com

7

# COVER SHEET
## Civil Case Filing Form
*(To be completed by Attorney/Party Prior to Filing of Pleading)*

Mississippi Supreme Court
Administrative Office of Courts

Form AOC/01
(Rev 2009)

**Court Identification Docket #**

| County # | Judicial District | Court ID (CH, CI, CO) |
|---|---|---|

**Case Year**

**Docket Number**

**Local Docket ID**

| Month | Date | Year |
|---|---|---|

This area to be completed by clerk

In the ~~County~~ (Circuit) Court of  HARRISON  County  —  FIRST  Judicial District

Case Number if filed prior to 1/1/94

## Origin of Suit (Place an "X" in one box only)

- [X] Initial Filing
- [ ] Remanded
- [ ] Reinstated
- [ ] Reopened
- [ ] Foreign Judgment Enrolled
- [ ] Joining Suit/Action
- [ ] Transfer from Other court
- [ ] Appeal
- [ ] Other

## Plaintiff - Party(ies) Initially Bringing Suit Should Be Entered First - Enter Additional Plaintiffs on Separate Form

**Individual**

| Last Name | First Name | Maiden Name, if applicable | M.I. | Jr/Sr/III/IV |
|---|---|---|---|---|

___ Check ( x ) if Individual Plaintiff is acting in capacity as Executor(trix) or Administrator(trix) of an Estate, and enter style:
Estate of

_X_ Check ( x ) if Individual Plaintiff is acting in capacity as Business Owner/Operator (d/b/a) or State Agency, and enter entity
D/B/A or Agency   Harrison County Utility Authority

**Business**

Enter legal name of business, corporation, partnership, agency - If Corporation, indicate the state where incorporated
___ Check ( x ) if Business Plaintiff is filing suit in the name of an entity other than the above, and enter below:
D/B/A

Address of Plaintiff  10271 Express Dr. Gulfport, MS 39503

Attorney (Name & Address)  T. Russell Nobile. 1105 30th Avenue. Suite 300. Gulfport, MS  39501

___ Check ( x ) if Individual Filing Initial Pleading is NOT an attorney          MS Bar No.  100682

Signature of Individual Filing:  *Russ Nobile*

## Defendant - Name of Defendant - Enter Additional Defendants on Separate Form

**Individual**

| Last Name | First Name | Maiden Name, if applicable | M.I. | Jr/Sr/III/IV |
|---|---|---|---|---|

___ Check ( x ) if Individual Defendant is acting in capacity as Executor(trix) or Administrator(trix) of an Estate, and enter style:
Estate of

___ Check ( x ) if Individual Defendant is acting in capacity as Business Owner/Operator (d/b/a) or State Agency, and enter entity:
D/B/A or Agency

**Business**  N-Y Associates, Inc.

Enter legal name of business, corporation, partnership, agency - If Corporation, indicate the state where incorporated
___ Check ( x ) if Business Defendant is acting in the name of an entity other than the above, and enter below:
D/B/A

Attorney (Name & Address) - If Known                                              MS Bar No.

**Damages Sought:**  Compensatory $ _____  Punitive $ _____  ___ Check ( x ) if child support is contemplated as an issue in this suit.*
*If checked, please submit completed Child Support Information Sheet with this Cover Sheet

## Nature of Suit (Place an "X" in one box only)

**Domestic Relations**
- [ ] Child Custody/Visitation
- [ ] Child Support
- [ ] Contempt
- [ ] Divorce:Fault
- [ ] Divorce: Irreconcilable Diff.
- [ ] Domestic Abuse
- [ ] Emancipation
- [ ] Modification
- [ ] Paternity
- [ ] Property Division
- [ ] Separate Maintenance
- [ ] Termination of Parental Rights
- [ ] UIFSA (eff 7/1/97; formerly URESA)
- [ ] Other

**Appeals**
- [ ] Administrative Agency
- [ ] County Court
- [ ] Hardship Petition (Driver License)
- [ ] Justice Court
- [ ] MS Dept Employment Security
- [ ] Worker's Compensation
- [ ] Other

**Business/Commercial**
- [ ] Accounting (Business)
- [ ] Business Dissolution
- [ ] Debt Collection
- [ ] Employment
- [ ] Foreign Judgment
- [ ] Garnishment
- [ ] Replevin
- [ ] Other

**Probate**
- [ ] Accounting (Probate)
- [ ] Birth Certificate Correction
- [ ] Commitment
- [ ] Conservatorship
- [ ] Guardianship
- [ ] Heirship
- [ ] Intestate Estate
- [ ] Minor's Settlement
- [ ] Muniment of Title
- [ ] Name Change
- [ ] Testate Estate
- [ ] Will Contest
- [ ] Other

**Children/Minors - Non-Domestic**
- [ ] Adoption - Contested
- [ ] Adoption - Uncontested
- [ ] Consent to Abortion Minor
- [ ] Removal of Minority
- [ ] Other

**Civil Rights**
- [ ] Elections
- [ ] Expungement
- [ ] Habeas Corpus
- [ ] Post Conviction Relief/Prisoner
- [ ] Other

**Contract**
- [X] Breach of Contract
- [ ] Installment Contract
- [ ] Insurance
- [ ] Specific Performance
- [ ] Other

**Statutes/Rules**
- [ ] Bond Validation
- [ ] Civil Forfeiture
- [ ] Declaratory Judgment
- [ ] Injunction or Restraining Order
- [ ] Other

**Real Property**
- [ ] Adverse Possession
- [ ] Ejectment
- [ ] Eminent Domain
- [ ] Eviction
- [ ] Judicial Foreclosure
- [ ] Lien Assertion
- [ ] Partition
- [ ] Tax Sale: Confirm/Cancel
- [ ] Title Boundary or Easement
- [ ] Other

**Torts**
- [ ] Bad Faith
- [ ] Fraud
- [ ] Loss of Consortium
- [ ] Malpractice - Legal
- [ ] Malpractice - Medical
- [ ] Mass Tort
- [ ] Negligence - General
- [ ] Negligence - Motor Vehicle
- [ ] Product Liability
- [ ] Subrogation
- [ ] Wrongful Death
- [ ] Other

AGREEMENT FOR PROFESSIONAL SERVICES
BETWEEN
HARRISON COUNTY UTILITY AUTHORITY
AND
N-Y ASSOCIATES, INC.

THIS IS AN AGREEMENT made on ___June 21, 2007___, between the
HARRISON COUNTY UTILITY AUTHORITY, 14108 Airport Road, Gulfport, Mississippi 39503
(OWNER), and N-Y ASSOCIATES, INC., 178 Main Street, Biloxi, Mississippi 39530-3830
(ENGINEER).

OWNER intends to construct The Biloxi Broadwater Water System Improvements (W-19).

The project is described in more detail in Exhibit A, "Project Description," and hereinafter
called the Project.

OWNER and ENGINEER, in consideration of the mutual covenants herein, agree with respect
to the performance of professional engineering services by ENGINEER with respect to the
Project and the payment for these services by OWNER as set forth herein.

SECTION 1 - BASIC SERVICES OF ENGINEER

1.1 ENGINEER shall provide for OWNER conceptual design phase services for the Project to
which this Agreement applies as hereinafter provided. These services will include serving as
OWNER's professional engineering representative for the Project, providing consultation and
advice and furnishing customary conceptual design phase services.

1.2 By execution of this Agreement, OWNER authorizes ENGINEER to provide Basic Services
for the Conceptual Design Phase of the Project in accordance with Exhibit B, "Scope of Design
Phase Services."

SECTION 2 - ADDITIONAL SERVICES OF ENGINEER

2.1 If authorized in writing by OWNER, ENGINEER shall provide, or obtain from other qualified
persons or firms, Additional Services that are not included as part of the Basic Services
specified in Section 1 as approved by the MDEQ. Additional Services shall include, but are not
limited to, the following:

2.1.1 Services resulting from significant changes in the general scope, extent or character of
the Project conceptually designed or specified by ENGINEER or its conceptual design
including, but not limited to, changes in size, complexity, OWNER's schedule, character of
construction or method of financing; and revising previously accepted studies, reports, design
documents or Contract Documents when such revisions are required by changes in laws,
rules, regulations, ordinances, codes or orders enacted subsequent to the preparation of such
studies, reports or documents, or are due to any other causes beyond ENGINEER's control.

2.1.2 Preparing to serve or serving as a consultant or witness for OWNER in any litigation,
arbitration or other legal or administrative proceeding involving the Project.

2.1.3 Services resulting from significant delays in Project schedule which occurred through no
fault of ENGINEER.

1

2.1.4 Services during out-of-town travel required of ENGINEER other than visits to the Project site or OWNER's office.

2.1.5 Additional Services in connection with the Project, including services which are to be furnished by OWNER in accordance with Section 3 and services not otherwise provided for in Basic Services as specified in Section 1 of this Agreement.

SECTION 3 - OWNER'S RESPONSIBILITIES

OWNER shall do the following in a timely manner so as not to delay the services of ENGINEER and bear all costs incident thereto:

3.1 Designate in writing a person to act as OWNER's representative with respect to the services to be rendered under this Agreement. Such person shall have complete authority to transmit instructions, receive information, and interpret and define OWNER's policies and decisions with respect to ENGINEER's services for the Project.

3.2 Provide all criteria and full information as to OWNER's requirements for the Project, including design objectives and constraints; space, capacity and performance requirements; and flexibility, expendability, and any budgetary limitations. Also furnish copies of design and construction standards which OWNER will require to be included in the Contract Documents.

3.3 Assist ENGINEER by placing at ENGINEER's disposal available information pertinent to the Project including previous reports; geotechnical information; utility locations; property descriptions, zoning, deed and other land use restrictions; and any other data relative to design or construction of the Project. ENGINEER shall not be liable for any claims for injury or loss arising from errors, omissions or inaccuracies in documents or other information provided by the OWNER.

3.4 Arrange for access to and make all provisions for ENGINEER to enter upon public and private property as required for ENGINEER to perform services under this Agreement.

3.5 Examine studies, reports, sketches, drawings, specifications, proposals and other documents presented by ENGINEER and render in writing decisions pertaining thereto within a reasonable time so as not to delay the services of ENGINEER.

3.6 Identify property for easements and rights-of-way required for construction of the Project.

3.7 Give prompt written notice to ENGINEER whenever OWNER observes or otherwise becomes aware of any development that affects the scope or timing of ENGINEER's services, or any defect or nonconformance in the work of the ENGINEER or of any Contractor.

SECTION 4 - PERIOD OF SERVICE

4.1 The provisions of this Section 4 and the various rates of compensation for ENGINEER's services provided for elsewhere in this Agreement have been agreed to in anticipation of the orderly and continuous progress of the Project through the Conceptual Design Phase to which this Agreement applies. Specific periods of time and/or completion dates for rendering services are set forth in Exhibit C, "Project Schedule".

2

4.2 If OWNER requests modifications or changes in the scope, extent or character of the Project, or if periods of time and/or completion dates are exceeded through no fault of ENGINEER, the period of service and amount of compensation for ENGINEER's services shall be adjusted equitably.

SECTION 5 - PAYMENTS TO ENGINEER

5.1 Methods of Payment. OWNER shall pay ENGINEER for Conceptual Design Services rendered under Section 1 and Additional Services rendered under Section 2 in accordance with the provisions of Exhibit D, "Payments to Engineer."

5.2 Times of Payment. ENGINEER shall submit monthly statements for services rendered. OWNER shall make prompt monthly payments in response to ENGINEER's monthly statements upon reimbursement from the CDBG Program.

5.3 Delinquent Payments. It is acknowledged and agreed that payments to ENGINEER by OWNER will not occur until reimbursement is received from the CDBG Program and no other terms for delivery of payment shall be enforced or initiated until such reimbursement is received. If OWNER objects to all or any portion of an invoice, OWNER shall notify the ENGINEER within 14 calendar days of the invoice date, identify the cause of the disagreement and pay when due that portion of the statement not in dispute.

5.4 Termination Payment. In the event of termination by OWNER or ENGINEER under Paragraph 6.2, OWNER shall pay ENGINEER for services and expenses provided to date of termination in accordance with the methods of payment specified in Paragraph 5.1.

5.5 Records of Costs. Records of costs pertinent to ENGINEER's compensation will be kept in accordance with generally accepted accounting principals. ENGINEER is only obligated to maintain these records for a period of three years following date of final payment for services rendered under this Agreement.

SECTION 6 - GENERAL TERMS AND CONDITIONS

6.1 Opinions of Cost. Since ENGINEER has no control over the cost of labor, materials, equipment or services furnished by others, or over the Contractor's methods of determining prices, or over competitive bidding or market conditions, ENGINEER's opinions of probable Construction Cost provided for herein are to be made on the basis of experience and qualifications and represent ENGINEER's best judgment as an experienced and qualified professional, generally familiar with the construction industry; but ENGINEER cannot and does not guarantee that proposals, bids or actual Construction Cost will not vary from opinions of probable cost prepared by ENGINEER or prepared by others and reviewed by ENGINEER.

6.2 Termination. The obligation to provide further services under this Agreement may be terminated by either party upon 30 calendar days' written notice in the event of substantial failure by the other party to perform in accordance with the terms hereof through no fault of the terminating party.

6.3 Suspension. Upon 14 calendar days' written notice to the ENGINEER, the OWNER may suspend the ENGINEER's work. Any suspension shall extend the period of service in a manner that is satisfactory to both the OWNER and the ENGINEER.

3

6.4 Ownership and Reuse of Documents.

6.4.1   Contract Documents and reports prepared by ENGINEER pursuant to this Agreement shall be the property of the OWNER. ENGINEER shall have the right to retain copies of all documents for his files.

6.4.2   Contract Documents prepared or furnished by ENGINEER and ENGINEER's independent professional associates and consultants, pursuant to this Agreement are instruments of service with respect to the Project. These documents are not intended or represented to be suitable for reuse by OWNER or others on extensions of the Project or on any other project. Any reuse without written verification or adaptation by ENGINEER for the specific purpose intended will be at OWNER's sole risk and without liability or legal exposure to ENGINEER, or to ENGINEER's independent professional associates or consultants. OWNER shall indemnify and hold harmless ENGINEER and ENGINEER's independent professional associates and consultants from all claims, damages, losses and expenses including attorneys' fees arising out of or resulting therefrom. Any such verification or adaptation will entitle ENGINEER to further compensation at rates to be agreed upon by OWNER and ENGINEER.

6.5 Insurance

6.5.1   The ENGINEER maintains workmen's compensation and unemployment compensation of a form and in an amount as required by state law; comprehensive general liability with maximum limits of $1,000,000 / $2,000,000; automotive liability with maximum limits of $1,000,000 / $1,000,000; umbrella liability $1,000,000/$1,000,000; and professional liability insurance with an annual limit of $500,000.

6.6   Personnel and Facilities. The ENGINEER has, or will secure at his own expense, personnel, equipment and other materials and supplies required to perform the services under this Agreement within the period of service set forth in Section 4. ENGINEER may subcontract a portion of these services, but these Subcontractors shall be subject to written approval by the OWNER. Such personnel shall not be employees of nor have contractual relationship with the OWNER.

6.7 Accounting System. The ENGINEER shall maintain an accounting system which accounts for costs in accordance with generally accepted accounting principles. The OWNER reserves the right to audit the ENGINEER's accounts which relate to services provided under this Agreement.

6.8 Successors and Assigns. Neither OWNER nor ENGINEER shall assign any interest in this Agreement without the prior written consent of the other and prior approval from MDEQ and in no case shall assignment relieve assignor from liability under this Agreement. This Agreement shall bind the successors and legal representatives of both parties. Nothing in this Agreement shall give any rights or benefits to anyone other than OWNER and ENGINEER.

6.9 Relationship. The OWNER has retained ENGINEER to provide professional services. These parties have not entered into any joint venture or partnership with the other. The ENGINEER is not to be considered the agent of the OWNER.

6.10 Standard of Care. The ENGINEER will strive to perform services under this Agreement in a manner consistent with that level of care and skill ordinarily exercised by members of the

4

profession currently practicing in the same locality under similar conditions. No other representation, express or implied, and no warranty or guarantee is included or intended in this Agreement, or in any report, opinion, document or otherwise.

6.11 Indemnification.

6.11.1 To the fullest extent permitted by law, the ENGINEER agrees to hold harmless and indemnify OWNER from and against liability arising out of ENGINEER's negligent performance of professional services under this Agreement. It is specifically understood and agreed that in no case shall the ENGINEER be required to pay an amount disproportional to ENGINEER's culpability, or any share of any amount levied to recognize more than actual economic damages.

6.11.2 In the event of joint or concurrent negligence of ENGINEER and OWNER, each shall bear that portion of the loss or expense that its share of the joint or concurrent negligence bears to the total negligence (including that of third parties) which caused the personal injury or property damage.

6.11.3 The OWNER shall not be liable to the ENGINEER and the ENGINEER shall not be liable to the OWNER for any special, incidental or consequential damages, including, but not limited to, loss of use and loss of profit, incurred by either party due to the fault of the other, regardless of the nature of this fault, or whether it was committed by the OWNER, or the ENGINEER or their employees, agents or subcontractors.

6.12 Recovery of Costs. In the event that legal action is brought by either party against the other, the prevailing party shall be reimbursed by the other for the prevailing party's legal costs, in addition to whatever other judgments or settlement amounts, if any, may be due.

6.13 Compliance with Codes and Standards. The ENGINEER's professional services shall incorporate those publicly announced federal, state and local laws, regulations, codes and standards that are applicable at the time the services are rendered. In the event of a change in a law, regulation, et al., the ENGINEER shall assess its impact. If, in the ENGINEER's professional opinion, the impact is such to significantly affect the ENGINEER's compensation or the period of service, then the compensation and/or period of service can be renegotiated.

6.14 Force Majeure. Neither OWNER nor ENGINEER shall be liable for faults or delays caused by any contingency beyond his control, including, but not limited to, acts of God, wars, strikes, walkouts, fires, natural calamities, or demands or requirements of governmental agencies.

6.15 Separate Provisions. If any provisions of this Agreement are held to be invalid or unenforceable, the remaining provisions shall be valid and binding.

6.16 Conflicts. In the event of a conflict between the main text of this Agreement and any appendix thereof, provisions of the main text shall govern.

6.17 Third Party Exclusion. This Agreement shall not create any rights or benefits to parties other than the OWNER and ENGINEER except other such rights as may be specifically called for herein.

5

6.18 Hazardous Materials

6.18.1 When hazardous materials are known, assumed or suspected to exist at a project site, ENGINEER is required to take appropriate precautions to protect the health and safety of his personnel, to comply with the applicable laws and regulations and to follow procedures deemed prudent to minimize physical risks to employees and the public. OWNER hereby warrants that, if he knows or has any reason to assume or suspect that hazardous materials may exist at the project site, he will inform ENGINEER in writing prior to initiation of services under this Agreement.

6.18.2 Hazardous materials may exist at a site where there is no reason to believe they could or should be present. OWNER agrees that the discovery of unanticipated hazardous materials constitutes a changed condition mandating a renegotiation of the scope of work or termination of services with prior approval from MDEQ.

ENGINEER agrees to notify OWNER as soon as practically possible should unanticipated hazardous materials or suspected hazardous materials be encountered. OWNER waives any claim against ENGINEER. OWNER also agrees to compensate ENGINEER for any time spent and expenses incurred by ENGINEER in defense of any such claim.

6.19 Governing Law. The laws of the State of Mississippi will govern the validity of this Agreement, its interpretations and performance, and remedies for any claims related to this Agreement.

6.20 Access to Records. The OWNER or designated Representative has the right to access and to audit, inspect, copy and examine books, financial records, and other documents relating directly to receipt and disbursement of funds for this project.

6.21 Designate in writing a person to act as ENGINEER's representative with respect to the services to be rendered under this Agreement.

SECTION 7 - DEFINITIONS

As used herein, the following words and phrases have the meanings indicated, unless otherwise specified in various sections of this Agreement:

7.1 Agreement. This Contract including all exhibits and documents included by reference.

7.2 Project Cost. Total cost of entire Project to OWNER not including ENGINEER's compensation and expenses, cost of land and rights-of-way, or compensation for or damages to properties, unless this Agreement so specifies; nor will it include OWNER's legal, accounting, insurance counseling or auditing services, or interest and financing charges incurred in connection with the Project or the cost of services to be provided by others to OWNER pursuant to Section 3 of this Agreement.

7.3 Direct Labor Costs. Salaries and wages paid to ENGINEER's personnel engaged directly on the Project, including engineers, draftsmen, technicians, designers, surveyors, resident project representatives and other technical and administrative personnel; but does not include indirect payroll related costs or fringe benefits.

6

7.4 Reimbursable Expenses. Actual expenses incurred by ENGINEER directly in connection with providing services for the Project. These include, but are not limited to, transportation and subsistence; reproduction and printing; communications; postage and express mail; equipment rental; and expense of computers and other specialized equipment.

SECTION 8 SPECIAL PROVISIONS AND EXHIBITS

8.1 This Agreement is subject to the following Special Provisions:

8.2 The following Exhibits are attached to and made a part of this Agreement:

8.2.1 Exhibit A, "Project Description."

8.2.2 Exhibit B, "Scope of Conceptual Design Phase Services."

8.2.3 Exhibit C, "Project Schedule."

8.2.4 Exhibit D, "Payments to Engineer."

8.2.5 Exhibit D1, "2007 Rate Schedule for Professional Services"

8.2.6 Exhibit E, "MDEQ Required Clauses."

8.2.7 Exhibit F, "HUD Special Provisions"

8.3 This Agreement, consisting of Pages 1 to 7 inclusive, together with the Exhibits identified above, constitute the entire agreement between OWNER and ENGINEER and supersede all prior written and oral understandings. This Agreement and said Exhibits may only be amended, supplemented, modified or canceled through a duly executed written instrument.

IN WITNESS WHEREOF, the parties hereto *have made and* executed this Agreement as of the day and year first written above.

OWNER: HARRISON COUNTY
UTILITY AUTHORITY

ENGINEER: N-Y ASSOCIATES, INC.

MILADY HOWARD
ASSISTANT VICE PRESIDENT

WITNESS: _____
WITNESS: _____

WITNESS: _____
WITNESS: _____

7

**EXHIBIT A**

**PROJECT DESCRIPTION**

This project consists of the following:

Twenty (20) percent conceptual design of an elevated water storage tank and associated transmission main for the Broadwater area.

Exhibit A - 1

**EXHIBIT B**

## SCOPE OF CONCEPTUAL DESIGN PHASE SERVICES
## FOR PROJECTS WITH TOTAL PROJECT BUDGET UP TO $5M

1.1   **Conceptual Design Phase.** After execution of the **Agreement**, the Conceptual Design Phase will be initiated and the **ENGINEER** shall:

    1.1.1   Consult with the **OWNER** to clarify and define the **OWNER's** requirements for the **Project**.

    1.1.2   Prior to commencement of work, consult and coordinate with MDEQ and its consultants on each one of the activities associated with this Scope of work, such that ENGINEER shall have the opportunity to participate in 20% of the work effort and compensation.

    1.1.3   Meet with MDEQ on behalf of the **OWNER** to plan proposed work and communicate the intent and the interests of the **OWNER** to MDEQ and its' representatives.

    1.1.4   Cooperate with MDEQ/MSEG to assure a timely and coordinated Conceptual Design product incorporating local inputs and regional concepts envisioned in the Gulf Regional Master Plan

    1.1.5   Assist MDEQ with the development of the proposed service boundaries for the **Project**.   Review and make recommendations for revisions to population/users, flows or demands, and capacities developed by MDEQ.  Provide documentation for any recommended changes.

    1.1.6   Assist CUA in developing service agreements with local service providers

    1.1.7   Review capacities and demands proposed by MDEQ on behalf of the OWNER.

    1.1.8   Assist MDEQ, and its consultants, by obtaining available data from the County Utility Authorities, units of local government, private utility

Exhibit B - 1

providers, and utility associations relative to the existing water, wastewater, and stormwater facilities pertinent to the program elements, including, but not limited to:

- Construction plans, hydraulic models and information, and design criteria for water, wastewater, and stormwater infrastructure (existing or planned) that will rely on the regional facilities;
- Inventory of water, wastewater, and stormwater systems in the area;
- Copies of the most current maps of the systems; and
- Obtain available land development and construction permitting information and projections for the community including residential, commercial and industrial development, land use, zoning, and other related information.

1.1.9    Assist MDEQ, and its consultants, to conduct interviews with the individual service providers in the community to determine their needs to be provided by the proposed projects. Conduct interviews with local management and operations staff having jurisdiction over the projected service area, and determine operational/functional and system component issues, including current and/or proposed regulatory issues which are anticipated to impact the projects.

1.1.10   Assist MDEQ, and its consultants, to obtain, using available data, a current land ownership map and topography map of the service area of the proposed project vicinity.

1.1.11   Assist MDEQ on behalf of the OWNER to review and make recommendations for conceptual site locations and route alignments.

1.1.12   Assist MDEQ by developing Conceptual Design Site Plan, performing field reconnaissance for route determination, and reviewing conceptual design plans proposed by MDEQ on behalf of the OWNER.

1.1.13   Make recommendations to MDEQ on behalf of the OWNER for equipment, materials for construction, and standard specifications and details approved by the OWNER for the Project.

Exhibit B - 2

1.1.14 Review conceptual design documents, design criteria, outline specifications, and conceptual opinions of probable project costs proposed by MDEQ on behalf of the **OWNER**.

1.1.15 Review essential attributes of the above system elements, as well as their recommended locations and interconnections to adjacent existing and proposed facilities proposed by MDEQ on behalf of the **OWNER**.

1.1.16 Report progress to the **OWNER, assist in obtaining local support and approval,** and make recommendations for action as appropriate during the Conceptual Design Phase of the **Project**.

1.1.17 The foregoing scope and the compensation for this phase were provided to the OWNER by MDEQ for inclusion in this agreement. It has been presented to the ENGINEER that the work to be assigned under this scope is commensurate with the budgeted compensation. Since the effort required for such tasks relies on the level of completion by others not under the direct control of the ENGINEER, the ENGINEER will advise the OWNER when 90% of Engineer's fees are incurred and request the OWNER's instructions regarding proceeding with the task. Once 90% of the ENGINEER's fees are incurred, the level of effort by the ENGINEER will depend upon the OWNER's direction and may be limited by the OWNER at the OWNER's option with respect to this scope to no more than reviewing the work provided by others and advising on revisions required for better adapting the work to local conditions.

**EXHIBIT C**

**PROJECT SCHEDULE**

The project schedule for completing the work submitted by the Subrecipient in the grant application is included in this grant agreement by reference.   This project schedule may be amended by written request of the Subrecipient and written approval of the request by the Department.

Project W19- Biloxi Broadwater Water System Improvements

By July 31, 2007, start conceptual design.

By April 22, 2008, complete final design.

By February 18, 2009, advertise for bids on all contracts.

By April 27, 2009, start construction all contracts.

By May 7, 2010, complete construction on all contracts.

Exhibit C - 1

W-19

**EXHIBIT D**

**PAYMENTS TO ENGINEER**

1.1 Basic Services. OWNER shall pay ENGINEER for Basic Services rendered under Section 1, as supplemented by Exhibit B, "Scope of Conceptual Design Phase Services" the following fees:

1.1.1   Conceptual Design Phase Services: Standard hourly rates in accordance with Exhibit F-1, "2007 Hourly Rate Schedule for Professional Services" plus Reimbursable Expenses with a Not To Exceed amount of $11,119.00. Services will not be continued beyond the Not To Exceed amount without prior written approval by OWNER.

1.2 For Additional Services. If additional services are authorized in writing by the OWNER and approved by MDEQ, OWNER shall pay ENGINEER for Additional Services rendered under Section 2 on the basis of ENGINEER's Standard Hourly Rates , "2007 Hourly Rate Schedule for Professional Services" plus Reimbursable Expenses. Subconsultants will be billed at actual cost times a factor of 1.1.

Exhibit D - 1

**EXHIBIT D1**

**2007 RATE SCHEDULE FOR PROFESSIONAL SERVICES**
**EMPLOYEE**

CLASSIFICATION POSITION HOURLY RATE

| | |
|---|---|
| Principal | $225.00 |
| Senior Project Manager | $186.00 |
| Project Engineer | $135.00 |
| Engineer Intern Graduate Engineer | $ 75.00 |
| Senior Certified Engineering Technician | $102.00 |
| Planner (AICP) | $113.00 |
| CADD Technician | $ 69.00 |
| Clerical | $ 61.00 |

* Hourly rates indicated for these non-exempt classifications apply to regular time. If overtime work is required to meet client's schedule, N-Y Associates, Inc. reserves the right to negotiate overtime rates.

**REIMBURSABLE EXPENSE SCHEDULE**
**EXPENSE COST**

Vehicle Mileage  (Travel)              $0.48

**IN-HOUSE REPRODUCTION/PRINTING**

| | |
|---|---|
| Vellum | $2.00/sheet |
| Film Positive | $5.00/sheet |
| Bond | $1.00/sheet |
| Blueline | $1.00/sheet |
| Photocopies | $0.20/sheet |

All other expenses, including contract reproduction/printing, travel and subsistence, parking, communications, equipment rental, postage and overnight mail, and supplies will be reimbursed at actual cost.

Exhibit D1 - 1

**Special Provisions Stipulated by the Mississippi Department of Environmental Quality
To Be Included In All Contracts Between The Subrecipient and Contracted Parties,
and In All Contracts Between Contracted Parties and Their Subcontractors**

For the purpose of clarification, the Contracted Party shall refer to the firm providing professional services, construction work, equipment, supplies, or commodities to the Subrecipient as specified in the contract to which this document is attached, and also all subcontractors to the contracted party.

1.   It is the duty of the subrecipient and contracted party to insure the construction of the project, including the letting of contracts in connection therewith, shall comply with all applicable laws and regulations and requirements of the United States of America or any agency thereof, the State of Mississippi or any agency thereof, or any local government or political subdivision to the extent that such requirements do not conflict with Federal laws and regulations and any regulations or policies established by the Commission on Environmental Quality.

2.   To the extent allowed by State Law, the subrecipient and contracted party agree to indemnify and save, release and hold harmless the State of Mississippi, the Commission on Environmental Quality, the Department, all of their employees and officers, and the Department's contractors from and against any and all claim, demand, cause of action, liability, loss, damage, injury, suit, judgement, debt and cost, including attorney's fees or expenses on the part of any contracted party, their agents or employees or any other parties arising out of or incident to, any and all work under the terms of this contract.

3.   The subrecipient and contracted party acknowledge and agree that the Department is not a party, in any manner whatsoever, to any contract between the subrecipient and the construction contractor(s), engineer(s), attorney(s), equipment supplier(s), subcontractor(s), or between any other parties of any kind whatsoever (hereinafter collectively referred to as "vendor"). The subrecipient and contracted party also acknowledge and agree that any benefit to vendors contracting with the subrecipient or contracted parties arising from, or associated with this contract is strictly incidental and all such vendors are not, and are not intended to be considered as third party beneficiaries under any agreement between the Department and subrecipient.

4.   Upon execution of any contract between the subrecipient and any other party in regard to this project, the Department does not assume any authorities, duties, responsibilities, or liabilities under such contract.

5.   The subrecipient and its vendors acknowledge and agree that no actions taken by the Department, either directly or indirectly, in regard to this project constitute or establish any determinations, authority, duty, responsibility, or liability under the contract(s) between the subrecipient and any other party.

6.   The subrecipient and its vendors acknowledge and agree that any action taken by the Department in its role of grantor, or in its separate and distinct role as regulator shall not in any way change or alter its position as that of grantor.

7.  The Department does not have any authority, duty, responsibility, or liability in contract claims or dispute identification, negotiation, resolution, or any other actions regarding contract claims under the contract(s) between the subrecipient and any other party.

8.  The subrecipient and the contracted party agree to resolve all claims and contract disputes by negotiations, arbitration, litigation, or other means as provided in the contract documents and state law, prior to submission of any related change order or contract amendment to the Department for review and approval, in order to obtain a grant eligibility or allowability determination.

9.  The subrecipient and the contracted party acknowledge and agree that the Department is not obligated to review, comment on, approve, or discuss the merits of any contract claims presented by or to any party. Any Department reviews, approvals, observations, presence at meetings, written communications, verbal communications or other actions are not to be interpreted as addressing the merits of any claims, nor are they to be construed as interpreting the contract between the subrecipient and the contracted party or any other parties.

SPECIAL PROVISIONS AND REGULATIONS STIPULATED BY
THE U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (HUD)
COMMUNITY DEVELOPMENT BLOCK GRANT (CDBG) PROGRAM
To Be Included in all Contracts Between the Subrecipient and Contracted Parties,
and In All Contracts Between Contracted Parties and Their Subcontractors

For the purpose of clarification, the Contracted Party shall refer to the firm providing professional services, construction work, equipment, supplies, or commodities to the Subrecipient as specified in the contract to which this document is attached, and also all subcontractors to the contracted party.

1.  **Access of Subrecipient, State of Mississippi, MDEQ and MDA, HUD and Others to CDBG Documents, Papers, and Books**

    The Contracted Party agrees to allow the Subrecipient, Departments and Agencies of the State of Mississippi, HUD, the Comptroller General of the United States, and any of their duly authorized representatives access to any books, documents, papers, and records of the Contracted Party which are directly pertinent to the CDBG Program for the purpose of making audits, examinations, excerpts, and transcriptions.

2.  **Termination of Contract For Cause**

    If, through any cause, the Contracted Party shall fail to fulfill in timely and proper manner, his obligations under this Contract, or if the Contracted Party shall violate any of the covenants, agreements, or stipulations of this Contract, the Subrecipient shall thereupon have the right to terminate this Contract by giving written notice to the Contracted Party of such termination and specifying the effective date of such termination. In such event, all finished or unfinished documents, data, studies, and reports prepared by the Contracted Party shall entitle the Contracted Party's receipt of just and equitable compensation for any satisfactory work completed on such documents.

    Notwithstanding the above, the Contracted Party shall not be relieved of liability to the Subrecipient for damages sustained to the Subrecipient by virtue of any breach of the Contract by the Contracted Party. The Subrecipient may withhold any payments to the Contracted Party for the purpose of set off until such time as the exact amount of damages due the Subrecipient from the Contracted Party is determined.

3.  **Termination for Convenience of the Subrecipient**

    The Subrecipient may terminate this Contract any time by a notice in writing from the Subrecipient to the Contracted Party. If the Contract is terminated by the Subrecipient as provided herein, the Contracted Party will be paid an amount which bears the same ratio to the total compensation as the services actually performed bear to the total services of the Contracted Party covered by this Contract, less payments of compensation previously made, provided that if less than sixty percent of the services covered by this Contract have been performed upon the effective date of such termination, the Contracted Party shall be reimbursed (in addition to the above payment) for that portion of actual out-of-

pocket expenses (not otherwise reimbursed under this Contract) incurred by the Contracted Party during the Contract period which are directly attributable to the incomplete portion of the services covered by this Contract.

4.   **Records**

All records required to be kept on the project shall be maintained for at least three years after final payments and until all other pending matters under the grant for this project are closed.

5.   **Health and Safety Standards**

All parties participating in this project agree to comply with Section 107 of the Contract Work Hours and Safety Standards Act.   Section 107 of the Act is applicable to construction work and provides that no laborer or mechanic shall be required to work in surroundings or under working conditions, which are unsanitary, hazardous, or dangerous to his health and safety as determined under construction, safety, and health standards promulgated by the Secretary of Labor.  These requirements do not apply to the purchase of supplies or materials or articles ordinarily available on the open market, or contracts for transportation.

6.   **Environmental Compliance**

Contracts, subcontracts, and subgrants of amounts in excess of $100,000.00 shall contain a provision which requires compliance with all applicable standards, orders, or requirements issued under Section 306 of the Clean Air Act (42 U.S.C. 1957 (h)), Section 508 of the Clean Water Act (33 U.S.C. 1368), Executive Order 11738, and Environmental Protection Agency (EPA) regulations (40 CFR, 15), which prohibit the use under nonexempt Federal contracts, grants, or loans of facilities included on the EPA List of Violating Facilities.  The provisions shall require reporting of violations to the grantor agency and the U.S. EPA Assistant Administrator for Enforcement (EN-329).

7.   **Energy Efficiency**

All participants in the projects shall recognize mandatory standards and policies relating to energy efficiency, which are contained in the state energy conservation plan issued in compliance with the Energy Policy and Conservation Act (PL 94-163).

8.   **Changes**

The Subrecipient may, from time to time, request changes in the scope of the services of the Contracted Party to be performed hereunder.  Such changes, including any increase or decrease in the amount of the Contracted Party's compensation which are mutually agreed upon by and between the Subrecipient and the Contracted Party, shall be incorporated in written and executed amendments to this Contract.

9.    **Personnel**

The Contracted Party represents that it has, or will secure at its own expense, all personnel required in performing the services under this Contract. Such personnel shall not be employees of or have any contractual relationship with the Subrecipient.

All the services required hereunder will be performed by the Contracted Party or under its supervision, and all personnel engaged in the work shall be fully qualified and shall be authorized or permitted under State and local law to perform such services.

No person who is serving sentence in a penal or correctional institution shall be employed on work under this Contract.

10.   **Anti-Kickback Rules**

Salaries of personnel performing work under this Contract shall be paid unconditionally and not less often than once a month without payroll deduction or rebate on any account except only such payroll deductions as are mandatory by law or permitted by the applicable regulations issued by the Secretary of Labor pursuant to the "Anti-Kickback Act" of June 13, 1934 (48 Stat. 948; 62 Stat. 740; 63 Stat. 108; Title 18 U.S.C. 874; and Title 40 U.S.C. 276c). The Contracted Party shall comply with all applicable "Anti-Kickback" regulations and shall insert appropriate provisions in all subcontracts covering work under this contract to insure compliance by the subcontractors with such regulations, and shall be responsible for the submission of affidavits required of subcontractors thereunder except as the Secretary of Labor may specifically provide for variations of or exemptions from the requirements thereof.

11.   **Equal Employment Opportunity**

During the performance of this Contract, the Contracted Party agrees to comply with Executive Order 11246, and the regulations issued pursuant thereto (24 CFR 130 and 41 CFR Chapter 60), which provides that no person shall be discriminated against on the basis of race, color, religion, gender, or national origin in all phases of employment during the performance of Federal or Federally assisted construction contracts. Contractors and subcontractors on Federal and Federally assisted construction contracts shall take affirmative action to ensure fair treatment in employments, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination, rates or pay or other forms of compensation and selection for training apprenticeship.

12.   **Anti-Discrimination Clauses**

The Contracted Party will comply with the following clauses:

1.    Title VI of the Civil Rights Act of 1964 (PL 88-352), and the regulations issued pursuant thereto (24 CFR 1), which provides that no person in the United States shall on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise

subjected to discrimination under any program or activity for which the Subrecipient receives Federal financial assistance and will immediately take any measures necessary to effectuate this assurance. If any real property or structure thereon is provided or improved with the aid of Federal financial assistance extended to the subrecipient, this assurance shall obligate the subrecipient, or in the case of any transfer of such property, any transferee, for the period during which the real property or structure is used for a purpose for which the Federal financial assistance is extended, or for another purpose involving the provision of similar services or benefits;

2. Title VIII of the Civil Rights Act of 1968 (PL 90-284), as amended, administering all programs and activities relating to housing and community development in a manner to affirmatively further fair housing, and taking action to affirmatively further fair housing in the sale or rental of housing, the financing of housing, and the provision of brokerage services; and,

3. Executive Order 11063, as amended by Executive Order 12259, on equal opportunity in housing and nondiscrimination in the sale or rental of housing built with Federal assistance. Section 109 of the Housing and Community Development Act of 1974, as amended which requires that no person in the United States shall on the grounds of race, color, national origin, or gender be excluded from participation in, be denied the benefits or be subjected to discrimination under, any program or activities funded in whole or in part with community development funds made available pursuant to the Act. Section 109 further provides that any prohibition against discrimination on the basis of age under the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.) or with respect to an otherwise qualified handicapped individual as provided in Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 796) shall also apply to any such program or activity.

13. **Section 3 Clause**

The Contracted Party will comply with Section 3 of the Housing and Urban Development Act of 1968, as amended (12 U.S.C. 17010) requiring that to the greatest extent feasible, opportunities for training and employment be given to lower income residents of the project area and contracts for work in connection with the project area be awarded to eligible business concerns which are located in, or owned in substantial part by persons residing in the area of the project.

14. **Discrimination Because of Certain Labor Matters**

No person employed on the work covered by this Contract shall be discharged or in any way discriminated against because he has filed any complaint or instituted or caused to be instituted any proceeding or has testified or is about to testify in any proceeding under or relating to the labor standards applicable hereunder to his employer.

15.    **Compliance with Local Laws**

The Contracted Party shall comply with all applicable laws, ordinances, and codes of the state and local governments, and shall commit no trespass on any public or private property in performing any of the work embraced by this Contract.

16.    **Subcontracting**

None of the services covered by this Contract shall be subcontracted without prior written consent of the Subrecipient. The Contracted Party shall be as fully responsible to the Subrecipient for the acts and omissions of his subcontractors and of persons either directly or indirectly employed by him. The Contracted Party shall insert in each subcontract appropriate provisions requiring compliance with the labor standards provisions of this Contract.

17.    **Assignability**

The Contracted Party shall not assign any interest in this Contract, and shall not transfer any interest in the same (whether by assignment or novation) without prior written approval of the Subrecipient provided that claims for money due or to become due the Contracted Party from the Subrecipient under this Contract may be assigned to a bank, trust company, or other financial institution, or to a Trustee in Bankruptcy, without such approval. Notice of any such assignment or transfer shall be furnished promptly to the Subrecipient.

18.    **Interest of Members of Local Public Agency and Others**

The Contracted Party agrees to establish safeguards to prohibit employees from using positions for a purpose that is or gives the appearance of being motivated by a desire for private gain for themselves or others, particularly those with whom they have a family, business, or other tie.

The Contracted Party will comply with Section 21-39-1, Mississippi Code Annotated (1972), which prohibits municipal officers and employees from having or owning any interest or share, individually or as agent or employee of any person or corporation, either directly or indirectly, in any contract made or let by the governing authorities of such municipality for the construction or doing of any public work, or for the sale or purchase of any materials, supplies or property of any description, or for any other purpose whatsoever, or in any subcontract arising therefrom or connected therewith, or to receive, either directly or indirectly, any portion or share of any money or other thing paid for the construction or doing of any public work, or for the sale or purchase of any property, or upon any other contract made by the governing authorities of the municipality, or subcontract arising therefore or connected therewith.

The Contracted Party will also be aware of and avoid any violation of Section 97-11-19, Mississippi Code Annotated (Supp. 1982), which prescribes a criminal penalty for any public officer who has an interest in any contract passed by the board of which he is a member during the term he was a member and for one year thereafter.

19.  **Interest of Certain Federal Officers**

No member of or delegate to the Congress of the United States and no Resident Commissioner, shall be admitted any share or part of this Contract or to any benefit to arise therefrom.

20.  **Interest of Contractor**

The Contracted Party covenants that he presently has no interest and shall not acquire any interest direct or indirect in the above described project or any parcels therein or any other interest which would conflict in any manner or degree with the performance of his services hereunder. The Contracted Party further covenants that in the performance of this Contract no person having any such interest shall be employed.

21.  **Political Activity**

The Contracted Party will comply with the provisions of the Hatch Act (5 U.S.C. 1501 et seq.), which limits the political activity of employees.

22.  **Davis-Bacon Act Requirements**

The Contracted Party will comply with Section 110 of the Housing and Community Development Act of 1974, as amended, which requires that all laborers and mechanics employed by contractors or subcontractors on construction work assisted under the Act shall be paid at rates not less than those prevailing on similar construction in the locality as determined by the Secretary of Labor in accordance with the Davis-Bacon Act, as amended 40 U.S.C. 276a-276-a5), and it will comply with the Contract Work Hours and Safety Standards Act (40 U.S.C. 327 et seq.). However, these requirements apply to the rehabilitation of residential property only if such property is designed for residential use of eight or more families.

a.  Withholding of Salaries

If in the performance of this Contract, there is any underpayment of salaries by the Contractor/subrecipient or by any subcontracted party thereunder, the subgrantee shall withhold from the Contractor/subrecipient out of payment due to him an amount sufficient to pay to employees underpaid the difference between the salaries required thereby to be paid and the salaries actually paid such employees for the total number of hours worked. The amounts withheld shall be disbursed by the subgrantee for and on account of the Contractor/subrecipient or subcontractor to the respective employees to whom they are due.

b.  Claims and Disputes Pertaining to Salary Rates

Claims and disputes pertaining to salary rates or to classifications of professional staff or technicians performing work under this Contract shall be promptly reported in writing by the Contractor/subrecipient to the

subgrantee for the latter's decision which shall be final with respect thereto.

23.   **Uniform Act Requirements**

The Contracted Party will comply with all applicable requirements of Titles II and III of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (42 U.S.C. 4630) as specified in regulations issued by the Secretary of the Department of Housing and Urban Development and published in 24 CFR 570-1.

24.   **Lead-Based Paint Requirements**

The Contracted Party will comply with Title IV of the Lead-Based Paint Poisoning Prevention Act (42 U.S.C. 4831), which prohibits the use of lead-based paint in residential structures constructed or rehabilitated with Federal assistance in any form.

25.   **Compliance with Office of Management and Budget**

The parties agree to comply with the regulations, policies, guidelines, and requirements of the Office of Management and Budget, Circulars A-95, A-102, A-133, and A-54, as they relate to the use of Federal funds under this contract.

26.   **Flood Insurance Purchase Requirements**

Both parties agree to comply with the flood insurance purchase requirements of Section 102(2) of the Flood Disaster Protection Act of 1973, (PL 93-234, 87 Stat. 975) approved December 31, 1976.  Section 102 (a) requires, on and after March 2, 1975, the purchase of flood insurance in communities where such insurance is available as a condition for the receipt of any Federal financial assistance for construction or acquisition purposes for use in any area that has been identified by the Secretary of the Department of Housing and Urban Development as an area having special flood hazards.  The phrase, "Federal financial assistance," includes any form of loan, grant, guaranty, insurance payment, rebate, subsidy, disaster assistance loan or grant, or any other form of direct or indirect Federal assistance.

27.   **Historic Preservation**

Both parties agree to assist the Federal grantor agency in its compliance with Section 106 of the National Historic Preservation Act of 1966 as amended (16 USC 470), Executive Order 11593, and the Archaeological and Historic Preservation Act of 1966 (16 USC 469a-I et seq.) by (a) consulting with the State Historic Preservation officer on the conduct of investigations, as necessary, to identify properties listed in or eligible for inclusion in the National Register of Historic Places that are subject to adverse effects (CFR Part 600.8) by the activity, and notifying the Federal grantor agency of the existence of any such properties, and by (b) complying with all requirements established by the Federal grantor agency and the state grantor agency to avoid or mitigate adverse effects upon such properties.

28.   **Program Monitoring**

Both parties agree to assist and cooperate with the Federal grantor agency and the state grantor agency or their duly designated representatives in the monitoring of the project or projects to which this grant relates, and to provide in form and manner approved by the state grantor agency such monitoring reports, progress reports, and the like as may be required and to provide such reports at the times specified.

29.   **Discrimination Due to Beliefs**

No person with responsibilities in operation of the project to which this grant relates will discriminate with respect to any program participant or any applicant for participation in such program because of political affiliation or beliefs.

30.   **Confidential Findings**

All of the reports, information, data, etc., prepared or assembled by the Contracted Party under this Contract are confidential, and the Contracted Party agrees that they shall not be made available to any individual or organization without prior written approval of the Subrecipient.

31.   **Third-Party Contracts**

The Subrecipient shall include in all contracts with Participating Parties receiving grant funds provisions requiring the following:

1.   Each such Participating Party keeps and maintains books, records, and other documents relating directly to the receipt and disbursement of such grant funds; and,

2.   Any duly authorized representative of the Mississippi Department of Environmental Quality, the Mississippi Development Authority, the U.S. Department of Housing and Urban Development, and the Comptroller General of the United States shall, at all reasonable times, have access to and the right to inspect, copy, audit, and examine all such books, records, and other documents of such Participating Party until the completion of all close-out procedures respecting this grant and the final settlement and conclusion of all issues arising out of this grant.

32.   **Lobbying**

The contracted party certifies, to the best of his or her knowledge and belief that:

1.   No federally appropriated funds have been paid or will be paid, by or on behalf of the contracted party, to any person for influencing or attempting to influence an officer or employee of any agency, a member of Congress, an officer or employee of Congress, or an employee of a member of Congress in connection with the awarding of any federal contract, the making of any federal grant, the making of any federal loan, the entering into of any

cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any federal contract, grant, loan, or cooperative agreement.

2. If any funds other than federally appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a member of Congress, an officer or employee of Congress, or an employee of a member of Congress in connection with this federal contract, grant, loan, or cooperative agreement, the contracted party shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," in accordance with its instructions.

33. <u>Architectural Barriers Act and Americans with Disabilities Act</u>

The parties will comply with the architectural Barriers Act and the Americans with Disabilities Act as described in 24 CFR Section 487(e).

Certifications and Assurances – U.S. Department of Housing and Urban
Development (HUD) Community Development Block Grant (CDBG) Program:
If applicable, Contracted Party agrees to comply with all certifications and
assurances required by HUD and the Mississippi Development Authority as set
out in "Exhibit __". The term "Applicant" in this exhibit is synonymous with the
term "Subrecipient".

## EXHIBIT __

## CERTIFICATIONS/ASSURANCES

Certifications for applicants, waiver and alternative requirement. Section 91.325 of title
24 Code of Federal Regulations is waived. Each applicant must make the following
certifications prior to receiving a CDBG disaster recovery grant:

a.  The applicant certifies that it will affirmatively further fair housing, which means
    that it will use the States analysis to identify impediments to fair housing choice
    within the applicants area, take appropriate actions to overcome the effects of
    any impediments identified through the States analysis, and maintain records
    reflecting the actions taken in this regard. (See 24 CFR 570.487(b)(2)(ii).)

b.  The applicant certifies that it has in effect and is following a residential anti-
    displacement and relocation assistance plan in connection with any activity
    assisted with funding under the CDBG program.

c.  The applicant certifies its compliance with restrictions on lobbying required by 24
    CFR part 87, together with disclosure forms, if required by that part.

d.  The applicant certifies it possesses the legal authority to carry out the program
    for which it is seeking funding, in accordance with applicable HUD regulations
    and this Notice.

e.  The applicant certifies that it will comply with the acquisition and relocation
    requirements of the Uniform Relocation Assistance and Real Property Acquisition
    Policies Act of 1970, as amended, and implementing regulations at 49 CFR part
    24, except where waivers or alternative requirements are provided for this grant.

f.  The applicant certifies that it will comply with section 3 of the Housing and Urban
    Development Act of 1968 (12 U.S.C. 1701u), and implementing regulations at 24
    CFR part 135.

g.  The applicant certifies that it is following a detailed citizen participation plan that
    satisfies the requirements of 24 CFR 91.115 and 24 CFR 570.486 (except as
    provided for in notices providing waivers and alternative requirements for this
    grant).

h.  The applicant certifies that it is complying with each of the following criteria:

    (1)  Funds will be used solely for necessary expenses related to disaster
         relief, long-term recovery, and restoration of infrastructure in the most
         impacted and distressed areas related to the consequences of the Gulf

Coast hurricanes of 2005 in communities included in Presidential disaster declarations.

(2) The applicant will not attempt to recover any capital costs of public improvements assisted with CDBG disaster recovery grant funds, by assessing any amount against properties owned and occupied by persons of low- and moderate-income, including any fee charged or assessment made as a condition of obtaining access to such public improvements, unless

1) disaster recovery grant funds are used to pay the proportion of such fee or assessment that relates to the capital costs of such public improvements that are financed from revenue sources other than under this title; or

2) for purposes of assessing any amount against properties owned and occupied by persons of moderate income, the grantee certifies to the Secretary that it lacks sufficient CDBG funds (in any form) to comply with the requirements of clause (A).

i. The applicant certifies that the grant will be conducted and administered in conformity with title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d) and the Fair Housing Act (42 U.S.C. 3601-3619) and implementing regulations.

j. The applicant certifies that they have adopted and is enforcing:

(1) A policy prohibiting the use of excessive force by law enforcement agencies within its jurisdiction against any individuals engaged in non-violent civil rights demonstrations; and

(2) A policy of enforcing applicable state and local laws against physically barring entrance to or exit from a facility or location that is the subject of such non-violent civil rights demonstrations within its jurisdiction.

k. The applicant certifies that it has the capacity to carry out disaster recovery activities in a timely manner.

l. The applicant certifies that is will not use CDBG Disaster Recovery funds for any activity in an area delineated as a special flood hazard area in FEMA's most current flood advisory maps unless it also ensures that the action is designed or modified to minimize harm to or within the floodplain in accordance with Executive Order 11988 and 24 CFR part 55.

m. The applicant certifies that it will comply with applicable laws.

# ⚡EPA

## COST OR PRICE SUMMARY
(see accompanying instructions before completing this form)

Form approved
OMB No. 2030-0011
Approval expires 10-31-86

### COST OR PRICE SUMMARY FORMAT FOR SUBAGREEMENTS UNDER U.S. EPA ASSISTANCE

#### PART I - GENERAL

| 1. RECIPIENT | | | | 2. ASSISTANCE IDENTIFICATION NO. |
|---|---|---|---|---|
| Harrison County Utility Authority | | | | R102-06 |
| 3. NAME OF CONTRACTOR OR SUBCONTRACTOR | | | | 4. DATE OF PROPOSAL |
| N-Y Associates, Inc. | | | | July 13, 2007 |
| 5. ADDRESS OF CONTRACTOR OR SUBCONTRACTOR | | 6. TYPE OF SERVICE TO BE FURNISHED | | |
| 178 Main Street | | Engineering Services for Biloxi Broadwater | | |
| Biloxi, MS 39530-3830 | | Water System Improvements (W-19) | | |

#### PART II - COST SUMMARY

| 7. DIRECT LABOR (Specify labor categories) | ESTIMATED HOURS | HOURLY RATE | | ESTIMATED COST | | TOTALS |
|---|---|---|---|---|---|---|
| Principal | 1 | $ | 72.61 | $ | 72.61 | |
| Senior Project Manager | 6 | $ | 60.02 | $ | 360.12 | |
| Project Engineer | 32 | $ | 43.56 | $ | 1,393.92 | |
| Senior Certified Engineering Technician | 22 | $ | 32.91 | $ | 724.02 | |
| Planner (AICP) | 4 | $ | 36.46 | $ | 145.84 | |
| CADD Technician | 34 | $ | 22.27 | $ | 757.18 | |
| Clerical | 5 | $ | 19.68 | $ | 98.40 | |
| DIRECT LABOR TOTAL: | | | | | | $ 3,552.09 |
| 8. INDIRECT COSTS (Specify indirect cost pools) | RATE | X BASE = | | ESTIMATED COST | | |
| Direct Labor | 1.7669 | $ | 3,552.09 | $ | 6,276.19 | |
| INDIRECT COSTS TOTAL: | | | | | | $ 6,276.19 |
| 9. OTHER DIRECT COSTS | | | | | | |
| a. TRAVEL | | | | ESTIMATED COST | | |
| (1) TRANSPORTATION: Mileage = $0.48 Per Miles @ 50 Miles | | | | $ | 24.00 | |
| (2) PER DIEM | | | | $ | | |
| TRAVEL SUBTOTAL: | | | | $ | 24.00 | |
| b. EQUIPMENT, MATERIALS, SUPPLIES (Specify categories) | QTY | COST | | ESTIMATED COST | | |
| Reproduction of Drawings on Bond | 5 | $ | 1.00 | $ | 5.00 | |
| Photocopies | 200 | $ | 0.20 | $ | 40.00 | |
| Courier Fees | 2 | $ | 15.00 | $ | 30.00 | |
| EQUIPMENT SUBTOTAL: | | | | $ | 75.00 | |
| c. SUBCONTRACTS | | | | ESTIMATED COST | | |
| None | | | | | | |
| SUBCONTRACTS SUBTOTAL: | | | | $ | 0.00 | |
| d. OTHER (Specify categories) | | | | ESTIMATED COST | | |
| None | | | | | | |
| OTHER SUBTOTAL: | | | | $ | 0.00 | |
| OTHER DIRECT COSTS TOTAL: | | | | | | $ 99.00 |
| 10. TOTAL ESTIMATED COST | | | | | | $ 9,927.28 |
| 11. PROFIT @ 12% | | | | | | $ 1,191.27 |
| 12. TOTAL PRICE | | | | | | $ 11,119.00 |

EPA Form 5700-41

Aug 21 07 09:47a        N Y Assoc Inc.            228-374-3002              p.4

| PART III - PRICE SUMMARY | | |
|---|---|---|
| 13. COMPETITOR'S CATALOG LISTINGS, IN-HOUSE ESTIMATES, PRIOR QUOTES *(Indicate basis for price comparison)* | MARKET PRICES(S) | PROPOSED PRICE |
| | | |
| N/A | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | $    0.00 |

## PART IV - CERTIFICATIONS

**14. CONTRACTOR**

**14a.** HAS A FEDERAL AGENCY OR FEDERALLY CERTIFIED STATE OR LOCAL AGENCY PERFORMED ANY REVIEW OF YOUR ACCOUNT RECORDS IN CONNECTION WITH ANY OTHER FEDERAL ASSISTANCE AGREEMENT OR CONTRACT WITHIN THE PAST 12 MONTHS

Yes      x  No      *(If "Yes" give name, address, and telephone number of reviewing office)*

See attached 2006 overhead audit prepared by an independent CPA for FAR Letter of Approval from LADOTD for calendar year 2006 not yet received.

**14b.** THIS SUMMARY CONFORMS WITH THE FOLLOWING COST PRINCIPLES

For profit organizations 48 CFR 31.105

**14c.** This proposal is submitted for use in connection with and in response to:

**(1)** Request for Proposals for Engineering Services for work relating to the implementation of a CDBG Gulf Regional Recovery Grant for the Biloxi Broadwater Water System Improvements  (W-19)

| This is to certify to the best of my knowledge and belief that the cost and pricing data summarized herein are complete, current, and accurate as of: | **(2) DATE** 7/13/07 |
|---|---|

I further certify that a financial management capability exists to fully accurately account for the financial transactions under this project. I further certify that I understand that the subagreement price may be subject to downward renegotiation and/or recoupment where the above cost and pricing data have been determined, as a result of audit, not to have been complete, current, and accurate as of the date above.

| **(3) TITLE OF PROPOSER** | **SIGNATURE OF PROPOSER** | **DATE OF EXECUTION** |
|---|---|---|
| Vice-President | Constantine F. Nicolaidis, PE | 8/1/07 |

**15. RECIPIENT REVIEWER**

I certify that I have reviewed the cost/price summary set forth herein and the proposed cost/price appear acceptable for subagreement award.

| **TITLE OF REVIEWER** | **SIGNATURE OF REVIEWER** | **DATE OF EXECUTION** |
|---|---|---|
| KAMRAN PAHLAVAN, P.E. EXECUTIVE DIRECTOR HARRISON COUNTY UTILITY AUTHORITY | | 1/11/08 |

**16. EPA REVIEWER**

| **TITLE OF REVIEWER** | **SIGNATURE OF REVIEWER** | **DATE OF EXECUTION** |
|---|---|---|
| | | |



**ASSOCIATES, Inc.**
CONSULTING ENGINEERS
**ARCHITECTS, LTD.**
ARCHITECTS & PLANNERS

2750 LAKE VILLA DRIVE   METAIRIE, LA 70002

(504)885-0500   FAX (504) 885-0595



# LETTER
# OF
# TRANSMITTAL

| DATE | | JOB NO. |
|---|---|---|
| May 5, 2008 | | 07015.02 |

ATTENTION
Michelle

| TO | | REFERENCE |
|---|---|---|
| Jimmy G. Gouras, Urban Planning and Consultants, Inc. | | Biloxi Broadwater Water System Improvements |
| 953 Howard Avenue | | Executed Final Design Contract |
| Biloxi, MS  39530 | | |

**WE ARE SENDING YOU:**

| | | |
|---|---|---|
| _x_ Attached | ___ Under separate cover via | ___ The following items: |
| ___ Shop Drawings | ___ Prints | ___ Plans | ___ Samples | ___ Specifications |
| ___ Copy of Letter | ___ Change Order | ___ | |

| COPIES | DATE | NO. | DESCRIPTION |
|---|---|---|---|
| 1 | 5/5/08 | | Original Contract of Referenced Project Executed by N-Y |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**THESE ARE TRANSMITTED as checked below:**

| | | |
|---|---|---|
| ___ For approval | ___ Approved as submitted | ___ Resubmit ___ copies for approval |
| ___ For your use | ___ Approved as noted* | ___ Submit ___ copies for distribution |
| _x_ As requested | ___ Returned for corrections | ___ Return ___ corrected prints |
| ___ For review and comment | | |
| ___ FOR BIDS DUE | | ___ PRINTS RETURNED AFTER LOAN TO US |

REMARKS

COPIES TO    FN/File, MFN,CFN, JW

SIGNED:
Constantine F. Nicoladis,  Vice President

If enclosures are not as noted, kindly notify us at once.

EXHIBIT
tabbies
2

# AGREEMENT FOR PROFESSIONAL SERVICES
## BETWEEN
## HARRISON COUNTY UTILITY AUTHORITY
## AND
## N-Y ASSOCIATES, INC.

THIS IS AN AGREEMENT made on _May 1_, 2008 between the HARRISON COUNTY UTILITY AUTHORITY, 10271 Express Drive, Gulfport, Mississippi 39503 (OWNER), and _____N-Y Associates, Inc._____ (ENGINEER).

OWNER intends to construct the Biloxi Broadwater Water System Improvements (W-19) as identified in the Mississippi Gulf Region Water and Wastewater Plan and funded through the Gulf Region Disaster Recovery Non-Emergency Community Development Grant program. The project is described in more detail in Exhibit A, "Project Description," and hereinafter called the Project.

OWNER and ENGINEER, in consideration of the mutual covenants herein, agree with respect to the performance of professional engineering services by ENGINEER with respect to the Project and the payment for these services by OWNER as set forth herein.

## SECTION 1 – BASIC SERVICES OF ENGINEER

1.1    ENGINEER shall provide for OWNER professional engineering services for the final design phase of the Project to which this Agreement applies as hereinafter provided.

These services will include serving as OWNER's professional engineering representative for the Project, providing consultation and advice and furnishing customary engineering services.

1.2    By execution of this Agreement, OWNER authorizes ENGINEER to provide Basic Services for the Final Design Phase of the Project in accordance with Exhibit B, "Scope of Final Design Phase Services."

## SECTION 2 – ADDITIONAL SERVICES OF ENGINEER

2.1    If authorized in writing by OWNER, ENGINEER shall provide, or obtain from other qualified persons or firms, Additional Services that are not included as part of the Basic Services specified in Section 1, as approved by MDEQ.  Additional Services shall include, but are not limited to, the following:

2.1.1    Services resulting from significant changes in the general scope, extent, or character of the of the Project designed or specified by ENGINEER or its design including, but not limited to, changes in size, complexity, OWNER's schedule, character of construction, or method of financing; and revising previously accepted studies, reports, design documents, or Contract Documents when such revisions are required by changes in laws, rules, regulations, ordinances, codes or orders enacted subsequent to the preparation of such studies, reports or documents, or are due to any other causes beyond ENGINEER's control.

2.1.2    Preparing to serve or serving as a consultant or witness for OWNER in any litigation, arbitration, or other legal or administrative proceeding involving the Project.

2.1.3   Services resulting from significant delays in Project schedule which occurred through no fault of ENGINEER.

2.1.4   Services during out-of-town travel required of ENGINEER other than visits to Project Site or OWNER's office.

2.1.5   Additional Services in connection with the Project, including services, which are to be, furnished by OWNER in accordance with Section 3 and services not otherwise provided for in Basic Services as specified in Section 1 of this Agreement.

## SECTION 3 – OWNER'S RESPONSIBILITIES

OWNER shall do the following in a timely manner so as not to delay the services of ENGINEER and bear all costs incident thereto:

3.1   Designate in writing a person to act as OWNER's representative with respect to the services to be rendered under this Agreement.   Such person shall have complete authority to transmit instructions, receive information, and interpret and define OWNER's policies and decisions with respect to ENGINEER's services for the Project.

3.2   Provide ENGINEER with all criteria and full information as to OWNER's requirements for the Project, including design objectives and constraints; space, capacity and performance requirements; and flexibility, expandability, and any budgetary limitations. Also furnish copies of all design and construction standards which OWNER will require to be included in the Contract Documents.

3.3     Assist ENGINEER by placing at ENGINEER's disposal available information pertinent to the Project including previous reports; geotechnical information; utility locations; property descriptions, zoning, deed and other land use restrictions; and any other data relative to design or construction of the Project. ENGINEER shall not be liable for any claims for injury or loss arising from errors, omissions or inaccuracies in documents or other information provided by the OWNER.

3.4     Arrange for safe access to and make all provisions for ENGINEER to enter upon public and private property as required for ENGINEER to perform services under this Agreement.

3.5     Examine all studies, reports, sketches, drawings, specifications, proposals, and other documents presented by ENGINEER and render in writing decisions pertaining thereto within a reasonable time so as not to delay the services of ENGINEER.

3.6     Identify property for easements and rights-of-way required for construction of the Project.

3.7  ·  Give prompt written notice to ENGINEER whenever OWNER observes or otherwise becomes aware of a Hazardous Environmental Condition or of any other development that affects the scope or time of performance of ENGINEER's services, or any defect or nonconformance in the work of the ENGINEER.


SECTION 4 – PERIOD OF SERVICE

4.1     The provisions of this Section 4 and the various rates of compensation for ENGINEER's services provided for elsewhere in this Agreement have been agreed to in anticipation of the orderly and continuous progress of the Project through completion of all phases to

which this **Agreement** applies. Specific periods of time and/or completion dates for rendering services are specified in this Agreement, ENGINEER's obligation to render services are set forth in **Exhibit C, "Project Schedule."**

4.2   If OWNER requests modifications or changes in the scope, extent or character of the **Project**, or if periods of time and/or completion dates are exceeded through no fault of ENGINEER, the period of service and amount of compensation for **ENGINEER's** services shall be adjusted equitably.

## SECTION 5 – PAYMENTS TO ENGINEER

5.1   **Methods of Payment.** OWNER shall pay ENGINEER for Basic Services rendered under Section 1 and Additional Services rendered under Section 2 in accordance with the provisions of Exhibit D, "Payments to Engineer."

5.2   **Times of Payment.** ENGINEER shall submit statements for services rendered in accordance with the billing schedule outlined in **Exhibit D, "Payments to Engineer."** OWNER shall make prompt payments in response to ENGINEER's statements upon reimbursement from the CDBG program.

5.3   **Delinquent Payments.** It is acknowledged and agreed that payments to ENGINEER by OWNER will not occur until reimbursement is received from the CDBG Program and no other terms for delivery of payment shall be enforced or initiated until such reimbursement is received. If OWNER objects to all or any portion of an invoice, OWNER shall notify the ENGINEER within 14 calendar days of the invoice date, identify the cause of the disagreement and pay when due that portion of the statement not in dispute.

5.4   **Termination Payment.** In the event of termination by OWNER or ENGINEER under Paragraph 6.2, OWNER shall pay ENGINEER for services and expenses provided to date of termination in accordance with the methods of payment specified in Paragraph 5.1.

5.5   **Records of Costs.** Records of costs pertinent to ENGINEER's compensation will be kept in accordance with generally accepted accounting principals. ENGINEER is only obligated to maintain these records for a period of three years following date of final payment for services rendered under this Agreement.

## SECTION 6 – GENERAL TERMS AND CONDITIONS

6.1   **Opinions of Cost.** Since ENGINEER has no control over the cost of labor, materials, equipment or services furnished by others, or over the Contractor's methods of determining prices, or over competitive bidding or market conditions, ENGINEER's opinions of probable Construction Cost provided for herein are to be made on the basis of experience and qualifications and represent ENGINEER's best judgment as an experienced and qualified professional, generally familiar with the construction industry; but ENGINEER cannot and does not guarantee that proposals, bids or actual Construction Cost will not vary from opinions of probable cost prepared by ENGINEER.

6.2   **Termination.** The obligation to provide further services under this Agreement may be terminated by either party upon 30 calendar days' written notice in the event of substantial failure by the other party to perform in accordance with the terms hereof through no fault of the terminating party.

6.3   Suspension.  Upon 14 calendar days' written notice to the ENGINEER, the OWNER may suspend the ENGINEER's work.  Any suspension shall extend the period of service in a manner that is satisfactory to both the OWNER and the ENGINEER.

6.4   Ownership and Reuse of Documents.

6.4.1   Contract Documents and reports prepared by ENGINEER pursuant to this Agreement shall be the property of the OWNER.  ENGINEER shall have the right to retain copies of all documents for his files.

6.4.2   Contract Documents prepared or furnished by ENGINEER and ENGINEER's independent professional associates and consultants, pursuant to this Agreement are instruments of service with respect to the Project.  These documents are not intended or represented to be suitable for reuse by OWNER or others on extensions of the Project or on any other project.  Any reuse without written verification or adaptation by ENGINEER for the specific purpose intended will be at OWNER's sole risk and without liability or legal exposure to ENGINEER, or to ENGINEER's independent professional associates or consultants.  Any such verification or adaptation will entitle ENGINEER to further compensation at rates to be agreed upon by OWNER and ENGINEER.

6.5   Insurance

The ENGINEER maintains workmen's compensation and unemployment compensation of a form and in an amount as required by state law; comprehensive general liability with maximum limits of $1,000,000/$2,000,000; automotive liability with maximun limits of

$1,000,000/\$1,000,000$; umbrella liability $1,000,000/\$1,000,000$; and professional liability insurance with an annual limit of $500,000.

6.6   **Personnel and Facilities.** The ENGINEER has, or will secure at his own expense, personnel, equipment and other materials and supplies required to perform the services under this Agreement within the period of service set forth in Section 4. ENGINEER may subcontract a portion of these services, but these Subcontractors shall be subject to written approval by the OWNER. Such personnel shall not be employees of nor have contractual relationship with the OWNER.

6.7   **Accounting System.** The ENGINEER shall maintain an accounting system, which accounts for costs in accordance with generally accepted accounting principles. The OWNER reserves the right to audit the ENGINEER's accounts, which relate to services, provided under this Agreement.

6.8   **Successors and Assigns.** Neither OWNER nor ENGINEER shall assign any interest in this Agreement without the prior written consent of the other, and MDEQ, and in no case shall assignment relieve assignor from liability under this Agreement. This Agreement shall bind the successors and legal representatives of both parties. Nothing in this Agreement shall give any rights or benefits to anyone other than OWNER and ENGINEER.

6.9   **Relationship.** The OWNER has retained ENGINEER to provide professional services. These parties have not entered into any joint venture or partnership with the other. The ENGINEER is not to be considered the agent of the OWNER.

6.10   **Standard of Care.**   The ENGINEER will strive to perform services under this Agreement in a manner consistent with that level of care and skill ordinarily exercised by members of the profession currently practicing in the same locality under similar conditions. No other representation, express or implied, and no warranty or guarantee is included or intended in the Agreement, or in any report, opinion, document or otherwise.

6.11   **Indemnification.**

6.11.1   To the fullest extent permitted by law, the ENGINEER agrees to hold harmless and indemnify OWNER from and against liability arising out of ENGINEER's negligent performance of professional services under this Agreement. It is specifically understood and agreed that in no case shall the ENGINEER be required to pay an amount disproportional to ENGINEER's culpability, or any share of any amount levied to recognize more than actual economic damages.

6.11.2   In the event of joint or concurrent negligence of ENGINEER and OWNER, each shall bear that portion of the loss or expense that its share of the joint or concurrent negligence bears to the total negligence (including that of third parties) which caused the personal injury or property damage.

6.11.3   The OWNER shall not be liable to the ENGINEER and the ENGINEER shall not be liable to the OWNER for any special, incidental or consequential damages, including, but not limited to, loss of use and loss of profit, incurred by either party due to the fault of the other, regardless of the nature of this fault, or whether it was committed by the OWNER, or the ENGINEER or their employees, agents or subcontractors.

6.12   **Recovery of Costs.**  In the event that legal action is brought by either party against the other, the prevailing party shall be reimbursed by the other for the prevailing party's legal costs, in addition to whatever other judgments or settlement amounts, if any, may be due.

6.13   **Compliance with Codes and Standards.**  The ENGINEER's professional services shall incorporate those publicly announced federal, state and local laws, regulations, codes and standards that are applicable at the time the services are rendered.  In the event of a change in a law, regulation, et al., the ENGINEER shall assess its impact.  If, in the ENGINEER's professional opinion, the impact is such to significantly affect the ENGINEER's compensation or the period of service, then the compensation and/or period of service can be renegotiated.

6.14   **Force Majeure.**  Neither OWNER nor ENGINEER shall be liable for  faults or delays caused by any contingency beyond his control, including, but not limited to, acts of God, wars, strikes, walkouts, fires, natural calamities, or demands or requirements of governmental agencies.

6.15   **Separate Provisions.**  If any provisions of this Agreement are held to be invalid or unenforceable, the remaining provisions shall be valid and binding.

6.16   **Conflicts.**  In the event of a conflict between the main text of this Agreement and any appendix thereof, provisions of the main text shall govern.

6.17   **Third Party Exclusion.**  This Agreement shall not create any rights or benefits to parties other than the OWNER and ENGINEER except other such rights as may be specifically called for herein.

6.18   **Hazardous Materials**

6.18.1 When hazardous materials are known, assumed or suspected to exist at a project site, ENGINEER is required to take appropriate precautions to protect the health and safety of his personnel, to comply with the applicable laws and regulations and to follow procedures deemed prudent to minimize physical risks to employees and the public. OWNER hereby warrants that, if he knows or has any reason to assume or suspect that hazardous materials may exist at the project site, he will inform ENGINEER in writing prior to initiation of services under this Agreement.

6.18.2 Hazardous materials may exist at a site where there is no reason to believe they could or should be present. OWNER agrees that the discovery of unanticipated hazardous materials constitutes a changed condition mandating a renegotiation of the scope of work or termination of services as approved by MDEQ. ENGINEER agrees to notify OWNER as soon as practically possible should unanticipated hazardous materials or suspected hazardous materials be encountered. OWNER waives any claim against ENGINEER.

6.19   Governing Law. The laws of the State of Mississippi will govern the validity of this Agreement, its interpretations and performance, and remedies for any claims related to this Agreement.

6.20   Access to Records. The OWNER or designated Representative has the right to access and to audit, inspect, copy and examine books, financial records, and other documents relating directly to receipt and disbursement of funds for this project.

6.21   Designate in writing a person to act as ENGINEER's representative with respect to the services to be rendered under this Agreement.

## SECTION 7 – DEFINITIONS

As used herein, the following words and phrases have the meanings indicated, unless otherwise specified in various sections of this Agreement:

7.1     Agreement.  This Contract including all exhibits and documents included by reference.

7.2     Direct Labor Costs.  Salaries and wages paid to ENGINEER's personnel engaged directly on the Project, including engineers, draftsmen, technicians, designers, surveyors, resident project representatives and other technical and administrative personnel; but does not include indirect payroll related costs or fringe benefits.

7.3     Project Cost.  Total cost of entire Project to OWNER not including ENGINEER's compensation and expenses, cost of land and rights-of-way, or compensation for or damages to properties, unless this Agreement so specifies; nor will it include OWNER's legal, accounting, insurance counseling or auditing services, or interest and financing charges incurred in connection with the Project or the cost of services to be provided by others to OWNER pursuant to Section 3 of this Agreement.

7.4     Reimbursable Expenses.  Actual expenses incurred by ENGINEER directly in connection with providing services for the Project.  These include, but are not limited to, transportation and subsistence; reproduction and printing; communications; postage and express mail; equipment rental; and expense of computers and other specialized equipment.

## SECTION 8 – SPECIAL PROVISIONS AND EXHIBITS

8.1     This Agreement is subject to the following Special Provisions:

8.1.1   ENGINEER hereby agrees to, and includes herein by reference, the "Special Provisions and Regulations stipulated by the U.S. Department of Housing and Urban Development (HUD), Community Development Block Grant (CDBG) Program," "Certifications and Assurances – U.S. Department of Housing and

Urban Development (HUD) Community Development Block Grant (CDBG) Program," and the "Special Provisions Stipulated By The Mississippi Department of Environmental Quality" as attached to and a part of Grant number HARCUA-02 and subsequent Grant Agreements.

8.1.2    The AUTHORITY and the ENGINEER acknowledge that this contract shall not become effective or enforceable until approval by the MDEQ.

8.1.3    The ENGINEER understands that all compensation to be paid under this agreement comes from the Gulf Region Disaster Recovery Non Emergency Grant awarded to the AUTHORITY by MDEQ and that no payment to the ENGINEER will be made until funds are received by the AUTHORITY from MDEQ.

8.2    The following Exhibits are attached to and made a part of this Agreement:

8.2.1    Exhibit A, "Project Description."

8.2.2    Exhibit B, "Scope of Final Design Phase Services."

8.2.3    Exhibit C, "Project Schedule."

8.2.4    Exhibit D, "Payments to Engineer."

8.2.5    Exhibit D-1, "Standard Hourly Rates Schedule."

8.2.6    Exhibit E, "Special Provisions and Regulations Stipulated by the U.S. Department of Housing and Urban Development (HUD) - Community Development Block Grant (CDBG) Program."

8.2.7    Exhibit F, "Certifications and Assurances – U.S. Department of Housing and Urban Development Community Development Block Grant Program."

8.2.8    Exhibit G, "MDEQ Special Provisions"

8.3    This Agreement, consisting of Pages 1 to 14 inclusive, together with the Exhibits identified above, constitute the entire agreement between OWNER and ENGINEER and supersede all prior written and oral understandings. This Agreement and said Exhibits may only be amended, supplemented, modified or canceled through a duly executed written instrument.

Agreement for Professional Services
Page 13 of 14

IN WITNESS WHEREOF, the parties hereto have made and executed this Agreement as of the day and year first written above.

OWNER: HARRISON COUNTY
UTILITY AUTHORITY

_____

ENGINEER: N-Y ASSOCIATES, INC.

_____
Constantine F. Nicoladis, Vice President

WITNESS: _____

WITNESS: _____

Agreement for Professional Services
Page 14 of 14

EXHIBIT A

EXHIBIT A

PROJECT DESCRIPTION

This project consists of the following:

Provide engineering services for an elevated water storage tank and associated transmission main for the Broadwater area in accordance with the conceptual site locations and route alignments, cost estimates, capacities as determined from models or otherwise, design criteria, and any other work products completed during the Conceptual Design Phase for W-19.

A-1

## EXHIBIT B

### SCOPE OF FINAL DESIGN PHASE SERVICES

1.1   **Final Design Phase:** After execution of the Agreement, the Final Design Phase will be initiated and the ENGINEER shall provide the following Basic Services:

1.  Prepare and submit 40% complete Preliminary Design Drawings to OWNER for review.

2.  Prepare and submit 95% and 100% complete Final Design Drawings, Project Technical Specifications and Final Cost estimate to OWNER for review.

3.  Prepare complete and detailed Issued for Construction Design Drawings and Project Specifications. All drawings and specifications are to be stamped, signed and dated by the Mississippi Professional Engineer of Record. The aforementioned items will be submitted to OWNER for final review.

4.  Prepare and submit detailed Construction Contract Documents to OWNER for review.

5.  No bidding or construction phase services shall be provided by the Engineer under this Agreement.

6.  Additional engineering services identified as of the date of this Agreement include topographic surveying, a geotechnical investigation and a report for the design of the foundation of the elevated water tank and services to support land acquisition for easements, rights-of-way or other acquisition needs which may include but not be limited to property and boundary surveys, title research, and the preparation of property descriptions and drawings.

B-1

EXHIBIT C
_____

EXHIBIT C

PROJECT SCHEDULE

The time periods for performances of Basic Services specified in Section 1, Exhibit B, "Scope of Final Design Phase Services" are stipulated as indicated below:

1.1     Proposed Biloxi Broadwater Water System Improvements (W-19)

     1.1.1   Final Design Phase services will be completed no later than <u>150</u> calendar days from the date of the Notice to Proceed, plus such additional time as may be considered reasonable for obtaining approval of governmental authorities having jurisdiction to approve Final Engineering Design documents, if such approval is to be obtained during the Final Engineering Design Phase.

C-1

**EXHIBIT D**

**PAYMENTS TO ENGINEER**

1.1    **Basic Services.** OWNER shall pay ENGINEER for Basic Services rendered under Section 1, as supplemented by Exhibit B, "Scope of Final Design Phase Services" as follows:

    1.1.1    **Final Design Phase Services:** Services will be provided for a Lump Sum Fee amount of One Hundred Seventy One Thousand, Twenty Seven Dollars ($171,027.00) with invoices submitted based on the following billing schedule:

| | | Billing amount |
|---|---|---|
| a. | Preliminary Design Submittal (40%) | $ 68,411 |
| b. | 95% Final Design Submittal (55%) | $ 94,065 |
| c. | 100% Final Design Submittal (5%) | $ 8,551 |

    The above fees include a credit for the entire Conceptual Design Phase fee. The Engineer has assumed in determining the above fee that the information and data contained in the Conceptual Design Phase Report is correct and will rely on this information and data in preparing the final plans.

1.2    For Additional Services. If additional services are authorized in writing by the OWNER and approved by MDEQ, OWNER shall pay ENGINEER for Additional Services rendered under Section 2 on the basis of ENGINEER's Standard Hourly Rates plus Reimbursable Expenses. Subconsultants will be billed at actual cost times a factor of 1.1. Such Additional Services include but may not be limited to:

    1.2.1    Topographic surveying required for detailed plans during the preparation of final design documents suitable for bidding at $10,681.00. (BFM Corporation, LLC fee of $9,710.00 x 1.10).

    1.2.2    Geotechnical investigation required for detailed plans during the preparation of final design documents suitable for bidding at $7,920.00. (Burns Cooley Dennis, Inc. fee of $7,200.00 x 1.10).

    1.2.3    Services to support land acquisition for easements, rights-of-way, or other acquisition needs. Services shall include, but not be limited to, property boundary surveys, title research, preparation of property/easement descriptions, meetings, etc.

The total compensation under this paragraph is estimated to be $6,778.20 (BFM Corporation L.L.C. fee of $6,162.00 x 1.10). The estimated total is based on the effort required for six (6) parcels. The total may be adjusted by amendment to this Agreement to be consistent with services actually rendered, and shall not exceed $6,778.20, unless approved in writing by the OWNER, with the concurrence of the Mississippi Department of Environmental Quality.

_____   **Exhibit D-1**

**Standard Hourly Rates Schedule (as of April 2008)**

| _Position_ | _Billing Rate_ |
|---|---|
| Principal (Capped) .................................................................................. | $200.00/Hour |
| Sr. Project Manager .................................................................................. | $185.00/Hour |
| Civil/Structural Engineer ........................................................................ | $140.00/Hour |
| Electrical Engineer .................................................................................. | $130.00/Hour |
| Sr. Engineering Designer/Technician ................................................... | $100.00/Hour |
| CADD Technician .................................................................................. | $ 65.00/Hour |
| Clerical/Word Processor ........................................................................ | $ 50.00/Hour |

Hourly rates shown for non-exempt classifications are for regular time. Overtime rates shall be calculated by multiplying the salary rate by 1.50 and adding in fringe benefits at regular time.

Expenses:

| | |
|---|---|
| Vehicle Mileage | 50.5¢/mile |
| Blue Line Prints | 10¢/S.F. |
| Photo Copies | 10¢/EA. |
| Film Positives | $1.25/S.F. |
| Contract Reproduction and Printing | Actual Cost |
| Travel and Subsistence to Places other than Project Site and Owner's Office | Actual Cost |
| Overnight Mail | Actual Cost |
| Equipment Rental | Actual Cost |
| Parking | Actual Cost |
| Any other Items Not Listed | Actual Cost |

Exhibit E

Special Provisions

The Agreement is amended to include the following:

SPECIAL PROVISIONS AND REGULATIONS STIPULATED BY
THE U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (HUD)
COMMUNITY DEVELOPMENT BLOCK GRANT (CDBG) PROGRAM
To Be Included in all Contracts Between the Subrecipient and Contracted Parties, and in
All Contracts Between Contracted Parties and Their Subcontractors

1.   Access of Subrecipient, State of Mississippi, MDEQ and MDA, HUD and Others to
     CDBG Documents, Papers, and Books

     The Contracted Party agrees to allow the Subrecipient, Departments and Agencies of the
     State of Mississippi, HUD, the Comptroller General of the United States, and any of their
     duly authorized representatives access to any books, documents, papers, and records of
     the Contracted Party which are directly pertinent to the CDBG Program for the purpose of
     making audits, examinations, excerpts, and transcriptions.

2.   Termination of Contract For Cause

     If, through any cause, the Contracted Party shall fail to fulfill in timely and proper
     manner, his obligations under this Contract, or if the Contracted Party shall violate any of
     the covenants, agreements, or stipulations of this Contract, the Subrecipient shall
     thereupon have the right to terminate this Contract by giving written notice to the
     Contracted Party of such termination and specifying the effective date of such
     termination.   In such event, all finished or unfinished documents, data, studies, and
     reports prepared by the Contracted Party shall entitle the Contracted Party's receipt of just
     and equitable compensation for any satisfactory work completed on such documents.

     Notwithstanding the above, the Contracted Party shall not be relieved of liability to the
     Subrecipient for damages sustained to the Subrecipient by virtue of any breach of the
     Contract by the Contracted Party.   The Subrecipient may withhold any payments to the
     Contracted Party for the purpose of set off until such time as the exact amount of
     damages due the Subrecipient from the Contracted Party is determined.

3.   Termination for Convenience of the Subrecipient

     The Subrecipient may terminate this Contract any time by a notice in writing from the
     Subrecipient to the Contracted Party. If the Contract is terminated by the Subrecipient as
     provided herein, the Contracted Party will be paid an amount which bears the same ratio
     to the total compensation as the services actually performed bear to the total services of
     the Contracted Party covered by this Contract, less payments of compensation previously
     made, provided that if less than sixty percent of the services covered by this Contract
     have been performed upon the effective date of such termination, the Contracted Party
     shall be reimbursed (in addition to the above payment) for that portion of actual out-of-
     pocket expenses (not otherwise reimbursed under this Contract) incurred by the

E - 1

Contracted Party during the Contract period which are directly attributable to the incomplete portion of the services covered by this Contract.

4.    Records

All records required to be kept on the project shall be maintained for at least three years after final payments and until all other pending matters under the grant for this project are closed.

5.    Health and Safety Standards

All parties participating in this project agree to comply with Section 107 of the Contract Work Hours and Safety Standards Act. Section 107 of the Act is applicable to construction work and provides that no laborer or mechanic shall be required to work in surroundings or under working conditions, which are unsanitary, hazardous, or dangerous to his health and safety as determined under construction, safety, and health standards promulgated by the Secretary of Labor. These requirements do not apply to the purchase of supplies or materials or articles ordinarily available on the open market, or contracts for transportation.

6.    Environmental Compliance

Contracts, subcontracts, and subgrants of amounts in excess of $100,000.00 shall contain a provision which requires compliance with all applicable standards, orders, or requirements issued under Section 306 of the Clean Air Act (42 U.S.C. 1957 (h)), Section 508 of the Clean Water Act (33 U.S.C. 1368), Executive Order 11738, and Environmental Protection Agency (EPA) regulations (40 CFR, 15), which prohibit the use under nonexempt Federal contracts, grants, or loans of facilities included on the EPA List of Violating Facilities. The provisions shall require reporting of violations to the grantor agency and the U.S. EPA Assistant Administrator for Enforcement (EN-329).

7.    Energy Efficiency

All participants in the projects shall recognize mandatory standards and policies relating to energy efficiency, which are contained in the state energy conservation plan issued in compliance with the Energy Policy and Conservation Act (PL 94-163).

8.    Changes

The Subrecipient may, from time to time, request changes in the scope of the services of the Contracted Party to be performed hereunder. Such changes, including any increase or decrease in the amount of the Contracted Party's compensation which are mutually agreed upon by and between the Subrecipient and the Contracted Party, shall be incorporated in written and executed amendments to this Contract.

9.    Personnel

The Contracted Party represents that it has, or will secure at its own expense, all personnel required in performing the services under this Contract. Such personnel shall not be employees of or have any contractual relationship with the Subrecipient.

B-2

All the services required hereunder will be performed by the Contracted Party or under its supervision, and all personnel engaged in the work shall be fully qualified and shall be authorized or permitted under State and local law to perform such services.

No person who is serving sentence in a penal or correctional institution shall be employed on work under this Contract.

10.   Anti-Kickback Rules

Salaries of personnel performing work under this Contract shall be paid unconditionally and not less often than once a month without payroll deduction or rebate on any account except only such payroll deductions as are mandatory by law or permitted by the applicable regulations issued by the Secretary of Labor pursuant to the "Anti-Kickback Act" of June 13, 1934 (48 Stat. 948; 62 Stat. 740; 63 Stat. 108; Title 18 U.S.C. 874; and Title 40 U.S.C. 276c). The Contracted Party shall comply with all applicable "Anti-Kickback" regulations and shall insert appropriate provisions in all subcontracts covering work under this contract to insure compliance by the subcontractors with such regulations, and shall be responsible for the submission of affidavits required of subcontractors thereunder except as the Secretary of Labor may specifically provide for variations of or exemptions from the requirements thereof.

11.   Equal Employment Opportunity

During the performance of this Contract, the Contracted Party agrees to comply with Executive Order 11246, and the regulations issued pursuant thereto (24 CFR 130 and 41 CFR Chapter 60), which provides that no person shall be discriminated against on the basis of race, color, religion, gender, or national origin in all phases of employment during the performance of Federal or Federally assisted construction contracts. Contractors and subcontractors on Federal and Federally assisted construction contracts shall take affirmative action to ensure fair treatment in employments, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination, rates or pay or other forms of compensation and selection for training apprenticeship.

12.   Anti-Discrimination Clauses

The Contracted Party will comply with the following clauses:

1.    Title VI of the Civil Rights Act of 1964 (PL 88-352), and the regulations issued pursuant thereto (24 CFR 1), which provides that no person in the United States shall on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program or activity for which the Subrecipient receives Federal financial assistance and will immediately take any measures necessary to effectuate this assurance. If any real property or structure thereon is provided or improved with the aid of Federal financial assistance extended to the subrecipient, this assurance shall obligate the subrecipient, or in the case of any transfer of such property, any transferee, for the period during which the real property or structure is used for a purpose for which the Federal financial assistance is extended, or for another purpose involving the provision of similar services or benefits;

E - 3

2.   Title VIII of the Civil Rights Act of 1968 (PL 90-284), as amended, administering all programs and activities relating to housing and community development in a manner to affirmatively further fair housing, and taking action to affirmatively further fair housing in the sale or rental of housing, the financing of housing, and the provision of brokerage services; and,

3.   Executive Order 11063, as amended by Executive Order 12259, on equal opportunity in housing and nondiscrimination in the sale or rental of housing built with Federal assistance.   Section 109 of the Housing and Community Development Act of 1974, as amended which requires that no person in the United States shall on the grounds of race, color, national origin, or gender be excluded from participation in, be denied the benefits or be subjected to discrimination under, any program or activities funded in whole or in part with community development funds made available pursuant to the Act. Section 109 further provides that any prohibition against discrimination on the basis of age under the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.) or with respect to an otherwise qualified handicapped individual as provided in Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 796) shall also apply to any such program or activity.

13.   <u>Section 3 Clause</u>

The Contracted Party will comply with Section 3 of the Housing and Urban Development Act of 1968, as amended (12 U.S.C. 17010) requiring that to the greatest extent feasible, opportunities for training and employment be given to lower income residents of the project area and contracts for work in connection with the project area be awarded to eligible business concerns which are located in, or owned in substantial part by persons residing in the area of the project.

14.   <u>Discrimination Because of Certain Labor Matters</u>

No person employed on the work covered by this Contract shall be discharged or in any way discriminated against because he has filed any complaint or instituted or caused to be instituted any proceeding or has testified or is about to testify in any proceeding under or relating to the labor standards applicable hereunder to his employer.

15.   <u>Compliance with Local Laws</u>

The Contracted Party shall comply with all applicable laws, ordinances, and codes of the state and local governments, and shall commit no trespass on any public or private property in performing any of the work embraced by this Contract.

16.   <u>Subcontracting</u>

None of the services covered by this Contract shall be subcontracted without prior written consent of the Subrecipient. The Contracted Party shall be as fully responsible to the Subrecipient for the acts and omissions of his subcontractors and of persons either directly or indirectly employed by him.   The Contracted Party shall insert in each subcontract appropriate provisions requiring compliance with the labor standards provisions of this Contract.

E - 4

17. **Assignability**

The Contracted Party shall not assign any interest in this Contract, and shall not transfer any interest in the same (whether by assignment or novation) without prior written approval of the Subrecipient provided that claims for money due or to become due the Contracted Party from the Subrecipient under this Contract may be assigned to a bank, trust company, or other financial institution, or to a Trustee in Bankruptcy, without such approval. Notice of any such assignment or transfer shall be furnished promptly to the Subrecipient.

18. **Interest of Members of Local Public Agency and Others**

The Contracted Party agrees to establish safeguards to prohibit employees from using positions for a purpose that is or gives the appearance of being motivated by a desire for private gain for themselves or others, particularly those with whom they have a family, business, or other tie.

The Contracted Party will comply with Section 21-39-1, Mississippi Code Annotated (1972), which prohibits municipal officers and employees from having or owning any interest or share, individually or as agent or employee of any person or corporation, either directly or indirectly, in any contract made or let by the governing authorities of such municipality for the construction or doing of any public work, or for the sale or purchase of any materials, supplies or property of any description, or for any other purpose whatsoever, or in any subcontract arising therefrom or connected therewith, or to receive, either directly or indirectly, any portion or share of any money or other thing paid for the construction or doing of any public work, or for the sale or purchase of any property, or upon any other contract made by the governing authorities of the municipality, or subcontract arising therefore or connected therewith.

The Contracted Party will also be aware of and avoid any violation of Section 97-11-19, Mississippi Code Annotated (Supp. 1982), which prescribes a criminal penalty for any public officer who has an interest in any contract passed by the board of which he is a member during the term he was a member and for one year thereafter.

19. **Interest of Certain Federal Officers**

No member of or delegate to the Congress of the United States and no Resident Commissioner, shall be admitted any share or part of this Contract or to any benefit to arise therefrom.

20. **Interest of Contractor**

The Contracted Party covenants that he presently has no interest and shall not acquire any interest direct or indirect in the above described project or any parcels therein or any other interest which would conflict in any manner or degree with the performance of his services hereunder. The Contracted Party further covenants that in the performance of this Contract no person having any such interest shall be employed.

E - 5

21.   Political Activity

The Contracted Party will comply with the provisions of the Hatch Act (5 U.S.C. 1501 et seq.), which limits the political activity of employees.

22.   Davis-Bacon Act Requirements

The Contracted Party will comply with Section 110 of the Housing and Community Development Act of 1974, as amended, which requires that all laborers and mechanics employed by contractors or subcontractors on construction work assisted under the Act shall be paid at rates not less than those prevailing on similar construction in the locality as determined by the Secretary of Labor in accordance with the Davis-Bacon Act, as amended 40 U.S.C. 276a-276-a5), and it will comply with the Contract Work Hours and Safety Standards Act (40 U.S.C. 327 et seq.). However, these requirements apply to the rehabilitation of residential property only if such property is designed for residential use of eight or more families.

    a.   Withholding of Salaries

If in the performance of this Contract, there is any underpayment of salaries by the Contractor/subrecipient or by any subcontracted party thereunder, the subgrantee shall withhold from the Contractor/subrecipient out of payment due to him an amount sufficient to pay to employees underpaid the difference between the salaries required thereby to be paid and the salaries actually paid such employees for the total number of hours worked. The amounts withheld shall be disbursed by the subgrantee for and on account of the Contractor/subrecipient or subcontractor to the respective employees to whom they are due.

    b.   Claims and Disputes Pertaining to Salary Rates

Claims and disputes pertaining to salary rates or to classifications of professional staff or technicians performing work under this Contract shall be promptly reported in writing by the Contractor/subrecipient to the subgrantee for the latter's decision which shall be final with respect thereto.

23.   Uniform Act Requirements

The Contracted Party will comply with all applicable requirements of Titles II and III of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (42 U.S.C. 4630) as specified in regulations issued by the Secretary of the Department of Housing and Urban Development and published in 24 CFR 570-1.

24.   Lead-Based Paint Requirements

The Contracted Party will comply with Title IV of the Lead-Based Paint Poisoning Prevention Act (42 U.S.C. 4831), which prohibits the use of lead-based paint in residential structures constructed or rehabilitated with Federal assistance in any form.

25.   **Compliance with Office of Management and Budget**

The parties agree to comply with the regulations, policies, guidelines, and requirements of the Office of Management and Budget, Circulars A-95, A-102, A-133, and A-54, as they relate to the use of Federal funds under this contract.

26.   **Flood Insurance Purchase Requirements**

Both parties agree to comply with the flood insurance purchase requirements of Section 102(2) of the Flood Disaster Protection Act of 1973, (PL 93-234, 87 Stat. 975) approved December 31, 1976. Section 102 (a) requires, on and after March 2, 1975, the purchase of flood insurance in communities where such insurance is available as a condition for the receipt of any Federal financial assistance for construction or acquisition purposes for use in any area that has been identified by the Secretary of the Department of Housing and Urban Development as an area having special flood hazards. The phrase, "Federal financial assistance," includes any form of loan, grant, guaranty, insurance payment, rebate, subsidy, disaster assistance loan or grant, or any other form of direct or indirect Federal assistance.

27.   **Historic Preservation**

Both parties agree to assist the Federal grantor agency in its compliance with Section 106 of the National Historic Preservation Act of 1966 as amended (16 USC 470), Executive Order 11593, and the Archaeological and Historic Preservation Act of 1966 (16 USC 469a-I *et seq.*) by (a) consulting with the State Historic Preservation officer on the conduct of investigations, as necessary, to identify properties listed in or eligible for inclusion in the National Register of Historic Places that are subject to adverse effects (CFR Part 600.3) by the activity, and notifying the Federal grantor agency of the existence of any such properties, and by (b) complying with all requirements established by the Federal grantor agency and the state grantor agency to avoid or mitigate adverse effects upon such properties.

28.   **Program Monitoring**

Both parties agree to assist and cooperate with the Federal grantor agency and the state grantor agency or their duly designated representatives in the monitoring of the project or projects to which this grant relates, and to provide in form and manner approved by the state grantor agency such monitoring reports, progress reports, and the like as may be required and to provide such reports at the times specified.

29.   **Discrimination Due to Beliefs**

No person with responsibilities in operation of the project to which this grant relates will discriminate with respect to any program participant or any applicant for participation in such program because of political affiliation or beliefs.

30.   **Confidential Findings**

All of the reports, information, data, etc., prepared or assembled by the Contracted Party under this Contract are confidential, and the Contracted Party agrees that they shall not be

B - 7

made available to any individual or organization without prior written approval of the Subrecipient.

31.   Third-Party Contracts

The Subrecipient shall include in all contracts with Participating Parties receiving grant funds provisions requiring the following:

   1.    Each such Participating Party keeps and maintains books, records, and other documents relating directly to the receipt and disbursement of such grant funds; and,

   2.    Any duly authorized representative of the Mississippi Department of Environmental Quality, the Mississippi Development Authority, the U.S. Department of Housing and Urban Development, and the Comptroller General of the United States shall, at all reasonable times, have access to and the right to inspect, copy, audit, and examine all such books, records, and other documents of such Participating Party until the completion of all close-out procedures respecting this grant and the final settlement and conclusion of all issues arising out of this grant.

32.   Lobbying

The contracted party certifies, to the best of his or her knowledge and belief that:

   1.    No federally appropriated funds have been paid or will be paid, by or on behalf of the contracted party, to any person for influencing or attempting to influence an officer or employee of any agency, a member of Congress, an officer or employee of Congress, or an employee of a member of Congress in connection with the awarding of any federal contract, the making of any federal grant, the making of any federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any federal contract, grant, loan, or cooperative agreement.

   2.    If any funds other than federally appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a member of Congress, an officer or employee of Congress, or an employee of a member of Congress in connection with this federal contract, grant, loan, or cooperative agreement, the contracted party shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," in accordance with its instructions.

33.   Architectural Barriers Act and Americans with Disabilities Act

The parties will comply with the architectural Barriers Act and the Americans with Disabilities Act as described in 24 CFR Section 487(e).

E - 8

Exhibit F

CERTIFICATIONS AND ASSURANCES – U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (HUD) COMMUNITY DEVELOPMENT BLOCK GRANT (CDBG) PROGRAM

The Agreement is amended to include the following:

Certifications and Assurances – U.S. Department of Housing and Urban Development (HUD) Community Development Block Grant (CDBG) Program: If applicable, Contracted party agrees to comply with all certifications and assurances required by HUD and the Mississippi Development Authority as set out in "Exhibit F". The term "Applicant" is synonymous with the term "Subrecipient."

EXHIBIT F
CERTIFICATIONS/ASSURANCES

Certifications for applicants, waiver and alternative requirement. Section 91.325 of title 24 Code of Federal Regulations is waived. Each applicant must make the following certifications prior to receiving a CDBG disaster recovery grant:

a.   The applicant certifies that it will affirmatively further fair housing, which means that it will use the States analysis to identify impediments to fair housing choice within the applicants area, take appropriate actions to overcome the effects of any impediments identified through the States analysis, and maintain records reflecting the actions taken in this regard. (See 24 CFR 570.487(b)(2)(ii).)

b.   The applicant certifies that it has in effect and is following a residential anti-displacement and relocation assistance plan in connection with any activity assisted with funding under the CDBG program.

c.   The applicant certifies its compliance with restrictions on lobbying required by 24 CFR part 87, together with disclosure forms, if required by that part.

d.   The applicant certifies it possesses the legal authority to carry out the program for which it is seeking funding, in accordance with applicable HUD regulations and this Notice.

e.   The applicant certifies that it will comply with the acquisition and relocation requirements of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, as amended, and implementing regulations at 49 CFR part 24, except where waivers or alternative requirements are provided for this grant.

F - 1

f.    The applicant certifies that it will comply with section 3 of the Housing and Urban Development Act of 1968 (12 U.S.C. 1701u), and implementing regulations at 24 CFR part 135.

g.    The applicant certifies that it is following a detailed citizen participation plan that satisfies the requirements of 24 CFR 91.115 and 24 CFR 570.486 (except as provided for in notices providing waivers and alternative requirements for this grant).

h.    The applicant certifies that it is complying with each of the following criteria:

    (1) Funds will be used solely for necessary expenses related to disaster relief, long-term recovery, and restoration of infrastructure in the most impacted and distressed areas related to the consequences of the Gulf Coast hurricanes of 2005 in communities included in Presidential disaster declarations.

    (2) The applicant will not attempt to recover any capital costs of public improvements assisted with CDBG disaster recovery grant funds, by assessing any amount against properties owned and occupied by persons of low- and moderate-income, including any fee charged or assessment made as a condition of obtaining access to such public improvements, unless

        1) disaster recovery grant funds are used to pay the proportion of such fee or assessment that relates to the capital costs of such public improvements that are financed from revenue sources other than under this title; or

        2) for purposes of assessing any amount against properties owned and occupied by persons of moderate income, the grantee certifies to the Secretary that it lacks sufficient CDBG funds (in any form) to comply with the requirements of clause (A).

i.    The applicant certifies that the grant will be conducted and administered in conformity with title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d) and the Fair Housing Act (42 U.S.C. 3601-3619) and implementing regulations.

j.    The applicant certifies that they have adopted and is enforcing:

    (1) A policy prohibiting the use of excessive force by law enforcement agencies within its jurisdiction against any individuals engaged in non-violent civil rights demonstrations; and

F - 2

(2) A policy of enforcing applicable state and local laws against physically barring entrance to or exit from a facility or location that is the subject of such non-violent civil rights demonstrations within its jurisdiction.

k.   The applicant certifies that it has the capacity to carry out disaster recovery activities in a timely manner.

l.   The applicant certifies that is will not use CDBG Disaster Recovery funds for any activity in an area delineated as a special flood hazard area in FEMA's most current flood advisory maps unless it also ensures that the action is designed or modified to minimize harm to or within the floodplain in accordance with Executive Order 11988 and 24 CFR part 55.

m.   The applicant certifies that it will comply with applicable laws.

F - 3

Exhibit G

## MDEQ Special Provisions

The Agreement is amended to include the following:

SPECIAL PROVISIONS STIPULATED BY THE MISSISSIPPI DEPARTMENT OF
ENVIRONMENTAL QUALITY TO BE INCLUDED IN ALL CONTRACTS BETWEEN THE
SUBRECIPIENT AND CONTRACTED PARTIES, AND IN ALL CONTRACTS BETWEEN
CONTRACTED PARTIES AND THEIR SUBCONTRACTORS

For the purpose of clarification, the Contracted Party shall refer to the firm providing professional services, construction work, equipment, supplies, or commodities to the Subrecipient as specified in the contract to which this document is attached, and also all subcontractors to the contracted party.

1. It is the duty of the subrecipient and contracted party to insure the construction of the project, including the letting of contracts in connection therewith, shall comply with all applicable laws and regulations and requirements of the United States of America or any agency thereof, the State of Mississippi or any agency thereof, or any local government or political subdivision to the extent that such requirements do not conflict with Federal laws and regulations and any regulations or policies established by the Commission on Environmental Quality.

2. To the extent allowed by State Law, the subrecipient and contracted party agree to indemnify and save, release and hold harmless the State of Mississippi, the Commission on Environmental Quality, the Department, all of their employees and officers, and the Department's contractors from and against any and all claim, demand, cause of action, liability, loss, damage, injury, suit, judgement, debt and cost, including attorney's fees or expenses on the part of any contracted party, their agents or employees or any other parties arising out of or incident to, any and all work under the terms of this contract.

3. The subrecipient and contracted party acknowledge and agree that the Department is not a party, in any manner whatsoever, to any contract between the subrecipient and the construction contractor(s), engineer(s), attorney(s), equipment supplier(s), subcontractor(s), or between any other parties of any kind whatsoever (hereinafter collectively referred to as "vendor"). The subrecipient and contracted party also acknowledge and agree that any benefit to vendors contracting with the subrecipient or contracted parties arising from, or associated with this contract is strictly incidental and all such vendors are not, and are not intended to be considered as third party beneficiaries under any agreement between the Department and subrecipient.

4. Upon execution of any contract between the subrecipient and any other party in regard to this project, the Department does not assume any authorities, duties, responsibilities, or liabilities under such contract.

G - 1

5. The subrecipient and it's vendors acknowledge and agree that no actions taken by the Department, either directly or indirectly, in regard to this project constitute or establish any determinations, authority, duty, responsibility, or liability under the contract(s) between the subrecipient and any other party.

6. The subrecipient and its vendors acknowledge and agree that any action taken by the Department in its role of grantor, or in its separate and distinct role as regulator shall not in any way change or alter its position as that of grantor.

7. The Department does not have any authority, duty, responsibility, or liability in contract claims or dispute identification, negotiation, resolution, or any other actions regarding contract claims under the contract(s) between the subrecipient and any other party.

8. The subrecipient and the contracted party agree to resolve all claims and contract disputes by negotiations, arbitration, litigation, or other means as provided in the contract documents and state law, prior to submission of any related change order or contract amendment to the Department for review and approval, in order to obtain a grant eligibility or allowability determination.

9. The subrecipient and the contracted party acknowledge and agree that the Department is not obligated to review, comment on, approve, or discuss the merits of any contract claims presented by or to any party.   Any Department reviews, approvals, observations, presence at meetings, written communications, verbal communications or other actions are not to be interpreted as addressing the merits of any claims, nor are they to be construed as interpreting the contract between the subrecipient and the contracted party or any other parties.

G - 2

AMENDMENT NO. 3

TO

STANDARD FORM OF AGREEMENT

BETWEEN OWNER AND ENGINEER

FOR

PROFESSIONAL SERVICES

BETWEEN

HARRISON COUNTY UTILITY AUTHORITY

AND

N-Y ASSOCIATES, INC.

FOR

BILOXI BROADWATER WATER SYSTEM IMPROVEMENTS

PROJECT W-19

WHEREAS, on the 1st day of May, 2008, the **HARRISON COUNTY UTILITY AUTHORITY,** 10271 Express Drive, Gulfport, MS 39507 (hereinafter called OWNER) and **N-Y ASSOCIATES, INC.** (hereinafter called ENGINEER), entered into an Agreement for professional services for Final Design Phase engineering services for Biloxi Broadwater Water System Improvements (W-19) funded through the Gulf Region Disaster Recovery Non-Emergency Community Development Grant program (hereinafter called PROJECT), and

WHEREAS, this Agreement was amended on the 25th day of July, 2008, and

WHEREAS, the Owner desires to incorporate **Bidding, Construction, and Post Construction Phase** engineering services to said Agreement.

NOW, THEREFORE, WE, **HARRISON COUNTY UTILITY AUTHORITY** and **N-Y ASSOCIATES, INC.** do hereby agree to change the Agreement for Professional Services dated May 1, 2008 and amended on July 25, 2008 to include Bidding, Construction, and Post-Construction Phase engineering services by amending and supplementing the original agreement as follows:

1. Section 8.2, add the following:

    8.2.10, Exhibit J, "Engineer's Services", consisting of 7 pages, (attached hereto).

**EXHIBIT**

**3**

8.2.11, Exhibit K, "Owner's Responsibilities", consisting of 1 page, (attached hereto).

8.2.12, Exhibit L, "Payments to Engineer for Services and Reimbursable Expenses", consisting of 4 pages, (attached hereto).

8.2.13, Appendix 1 to Exhibit L, "Reimbursable Expenses Schedule", consisting of 1 page, (attached hereto).

8.2.14, Appendix 2 to Exhibit L, "Standard Hourly Rates Schedule", consisting of 1 page, (attached hereto).

8.2.15, Exhibit M, "Duties, Responsibilities and Limitations of Authority of Resident Project Representative," consisting of 4 pages, (attached hereto).

8.2.16, Exhibit N, "Notice of Acceptability of Work", consisting of 1 page, (attached hereto).

IN WITNESS THEREOF, the parties hereto have executed this Amendment No. 3, the Effective Date of this Amendment No. 3 being 2009.

**OWNER:**

**HARRISON COUNTY UTILITY AUTHORITY**

By: _____
Kamran Pahlavan

Title: Executive Director

Date Signed _____10/7/09_____

**ENGINEER:**

**N-Y ASSOCIATES, INC.**

By: _____
Constantine F. Nicoladis, PE

Title:  Vice -President

Date Signed: _____9/10/09_____

## Exhibit J

This is EXHIBIT J (Amendment 2), consisting of 7 pages, referred to in and part of Amendment No. 3, dated _____ 10/1/__, 2009 to the Agreement between OWNER and ENGINEER for Professional Services, dated May 1, 2009.

**ENGINEER's Services**

Article 1 of the Agreement is amended and supplemented to include the following agreement of the parties. ENGINEER shall provide Basic and Additional Services as set forth below.

PART 1 -- BASIC SERVICES

A.1.01 *Study and Report Phase*

SECTION DELETED IN ORIGINAL AGREEMENT

A.1.02 *Preliminary Design Phase*

SECTION DELETED IN ORIGINAL AGREEMENT

1.1 and 1.2 *Final Design Phase*

SECTION INCLUDED IN ORIGINAL AGREEMENT

A.1.3 *Bidding or Negotiating Phase*

A.    The number of prime contracts for the Work designed or specified by ENGINEER upon which the ENGINEER's compensation has been established under this Agreement is 2, which includes the installation of a potable water transmission line and the construction of an elevated water tank in the Broadwater area of the City of Biloxi.

B.    After acceptance by Owner of the Bidding Documents and the most recent opinion of probable Construction Cost as determined in the Final Design Phase and upon written authorization by Owner to proceed, Engineer shall:

　　　1.    Assist Owner in advertising for and obtaining bids or proposals for the Work and, where applicable, maintain a record of prospective bidders to whom Bidding Documents have been issued, attend pre-Bid conferences, if any, and receive and process contractor deposits or charges for the Bidding Documents.

　　　2.    Issue Addenda as appropriate to clarify, correct, or change the Bidding Documents.

　　　3.    Provide information or assistance needed by Owner in the course of any negotiations with prospective contractors.

　　　4.    Consult with Owner as to the acceptability of subcontractors, suppliers, and other individuals and entities proposed by prospective contractors for those portions of the Work as to which such acceptability is required by the Bidding Documents.

　　　5.    Perform or provide the following additional Bidding or Negotiating Phase tasks or deliverables: Provide Bidding or Negotiation Phase Services for two prime contracts.

      6.   Attend the Bid opening, prepare Bid tabulation sheets, and assist Owner in evaluating Bids or proposals and in assembling and awarding contracts for the Work.

C.     The Bidding or Negotiating Phase will be considered complete upon commencement of the Construction Phase or upon cessation of negotiations with prospective contractors.

### A.1.4 *Construction Phase*

A.     Upon successful completion of the Bidding and Negotiating Phase, and upon written authorization from Owner, Engineer shall:

      1.   *General Administration of Construction Contract.*  Consult with Owner and act as Owner's representative as provided in the General Conditions.  The extent and limitations of the duties, responsibilities, and authority of Engineer as assigned in the General Conditions shall not be modified, except as Engineer may otherwise agree in writing.  All of Owner's instructions to Contractor will be issued through Engineer, which shall have authority to act on behalf of Owner in dealings with Contractor to the extent provided in this Agreement and the General Conditions except as otherwise provided in writing.

      2.   *Resident Project Representative (RPR).*  Provide the services of an RPR at the Site to assist the Engineer and to provide more extensive observation of Contractor's work.  Duties, responsibilities, and authority of the RPR are as set forth in Exhibit K.  The furnishing of such RPR's services will not limit, extend, or modify Engineer's responsibilities or authority except as expressly set forth in Exhibit K.

      3.   *Selecting Independent Testing Laboratory.*  The Owner may elect to choose an Independent Testing Laboratory. In the event the Owner elects not to do so, the Engineer will assist Owner in the selection of an independent testing laboratory to perform the services identified in Paragraph A1.4.A13 of this Exhibit H.

      4.   *Pre-Construction Conference.* Participate in a pre-construction conference.

      5.   *Schedules.*  Receive, review, and determine the acceptability of any and all schedules that Contractor is required to submit to Engineer, including the Progress Schedule, Schedule of Submittals, and Schedule of Values.

      6.   *Baselines and Benchmarks.*  As appropriate, establish baselines and benchmarks for locating the Work which in Engineer's judgment are necessary to enable Contractor to proceed.

      7.   *Visits to Site and Observation of Construction.*  In connection with observations of Contractor's Work while it is in progress:

          a.   Make visits to the Site at intervals appropriate to the various stages of construction, as Engineer deems necessary, to observe as an experienced and qualified design professional the progress and quality of Contractor's executed Work.  Such visits and observations by Engineer, and the Resident Project Representative, if any, are not intended to be exhaustive or to extend to every aspect of Contractor's Work in progress or to involve detailed inspections of Contractor's Work in progress beyond the responsibilities specifically assigned to Engineer in this Agreement and the Contract Documents, but rather are to be limited to spot checking, selective sampling, and similar methods of general observation of the Work based on Engineer's exercise of professional judgment as assisted by the Resident Project Representative, if any.  Based on information obtained during such visits and observations, Engineer will determine in general if the Work is proceeding in accordance with the Contract Documents, and Engineer shall keep Owner informed of the progress of the Work.

b.  The purpose of Engineer's visits to, and representation by the Resident Project Representative, if any, at the Site, will be to enable Engineer to better carry out the duties and responsibilities assigned to and undertaken by Engineer during the Construction Phase, and, in addition, by the exercise of Engineer's efforts as an experienced and qualified design professional, to provide for Owner a greater degree of confidence that the completed Work will conform in general to the Contract Documents and that Contractor has implemented and maintained the integrity of the design concept of the completed Project as a functioning whole as indicated in the Contract Documents.  Engineer shall not, during such visits or as a result of such observations of Contractor's Work in progress, supervise, direct, or have control over Contractor's Work, nor shall Engineer have authority over or responsibility for the means, methods, techniques, sequences, or procedures of construction selected or used by Contractor, for security or safety on the Site, for safety precautions and programs incident to Contractor's Work, nor for any failure of Contractor to comply with Laws and Regulations applicable to Contractor's furnishing and performing the Work.  Accordingly, Engineer neither guarantees the performance of any Contractor nor assumes responsibility for any Contractor's failure to furnish and perform the Work in accordance with the Contract Documents.

8.  *Defective Work.*  Recommend to Owner that Contractor's Work be rejected while it is in progress if, on the basis of Engineer's observations, Engineer believes that such Work will not produce a completed Project that conforms generally to the Contract Documents or that it will threaten the integrity of the design concept of the completed Project as a functioning whole as indicated in the Contract Documents.

9.  *Clarifications and Interpretations; Field Orders.*  Issue necessary clarifications and interpretations of the Contract Documents as appropriate to the orderly completion of Contractor's work.  Such clarifications and interpretations will be consistent with the intent of and reasonably inferable from the Contract Documents.  Engineer may issue Field Orders authorizing minor variations in the Work from the requirements of the Contract Documents.

10.  *Change Orders and Work Change Directives.*  Recommend Change Orders and Work Change Directives to Owner, as appropriate, and prepare Change Orders and Work Change Directives as required.

11.  *Shop Drawings and Samples.*  Review and approve or take other appropriate action in respect to Shop Drawings and Samples and other data which Contractor is required to submit, but only for conformance with the information given in the Contract Documents and compatibility with the design concept of the completed Project as a functioning whole as indicated by the Contract Documents.  Such reviews and approvals or other action will not extend to means, methods, techniques, sequences, or procedures of construction or to safety precautions and programs incident thereto.  Engineer shall meet any Contractor's submittal schedule that Engineer has accepted.

12.  *Substitutes and "or-equal."*  Evaluate and determine the acceptability of substitute or "or-equal" materials and equipment proposed by Contractor, but subject to the provisions of Paragraph A2.02.A.2 of this Exhibit H.

13.  *Inspections and Tests.*  Require such special inspections or tests of Contractor's work as deemed reasonably necessary, and receive and review all certificates of inspections, tests, and approvals required by Laws and Regulations or the Contract Documents.  Engineer's review of such certificates will be for the purpose of determining that the results certified indicate compliance with the Contract Documents and will not constitute an independent evaluation that the content or procedures of such inspections, tests, or approvals comply with the requirements of the Contract Documents.  Engineer shall be entitled to rely on the results of such tests.

14. *Disagreements between Owner and Contractor.* Render formal written decisions on all duly submitted issues relating to the acceptability of Contractor's work or the interpretation of the requirements of the Contract Documents pertaining to the execution, performance, or progress of Contractor's Work; review each duly submitted Claim by Owner or Contractor, and in writing either deny such Claim in whole or in part, approve such Claim, or decline to resolve such Claim if Engineer in its discretion concludes that to do so would be inappropriate. In rendering such decisions, Engineer shall be fair and not show partiality to Owner or Contractor and shall not be liable in connection with any decision rendered in good faith in such capacity.

15. *Applications for Payment.* Based on Engineer's observations as an experienced and qualified design professional and on review of Applications for Payment and accompanying supporting documentation:

   a. Determine the amounts that Engineer recommends Contractor be paid. Such recommendations of payment will be in writing and will constitute Engineer's representation to Owner, based on such observations and review, that, to the best of Engineer's knowledge, information and belief, Contractor's Work has progressed to the point indicated, the quality of such Work is generally in accordance with the Contract Documents (subject to an evaluation of the Work as a functioning whole prior to or upon Substantial Completion, to the results of any subsequent tests called for in the Contract Documents, and to any other qualifications stated in the recommendation), and the conditions precedent to Contractor's being entitled to such payment appear to have been fulfilled in so far as it is Engineer's responsibility to observe Contractor's Work. In the case of unit price work, Engineer's recommendations of payment will include final determinations of quantities and classifications of Contractor's Work (subject to any subsequent adjustments allowed by the Contract Documents).

   b. By recommending any payment, Engineer shall not thereby be deemed to have represented that observations made by Engineer to check the quality or quantity of Contractor's Work as it is performed and furnished have been exhaustive, extended to every aspect of Contractor's Work in progress, or involved detailed inspections of the Work beyond the responsibilities specifically assigned to Engineer in this Agreement and the Contract Documents. Neither Engineer's review of Contractor's Work for the purposes of recommending payments nor Engineer's recommendation of any payment including final payment will impose on Engineer responsibility to supervise, direct, or control Contractor's Work in progress or for the means, methods, techniques, sequences, or procedures of construction or safety precautions or programs incident thereto, or Contractor's compliance with Laws and Regulations applicable to Contractor's furnishing and performing the Work. It will also not impose responsibility on Engineer to make any examination to ascertain how or for what purposes Contractor has used the moneys paid on account of the Contract Price, or to determine that title to any portion of the Work in progress, materials, or equipment has passed to Owner free and clear of any liens, claims, security interests, or encumbrances, or that there may not be other matters at issue between Owner and Contractor that might affect the amount that should be paid.

16. *Contractor's Completion Documents.* Receive, review, and transmit to Owner maintenance and operating instructions, schedules, guarantees, bonds, certificates or other evidence of insurance required by the Contract Documents, certificates of inspection, tests and approvals, Shop Drawings, Samples and other data approved as provided under Paragraph A1.4.A.11 and the annotated record documents which are to be assembled by Contractor in accordance with the Contract Documents to obtain final payment. The extent of such review by Engineer will be limited as provided in Paragraph A1.4.A.11.

17. *Substantial Completion.* Promptly after notice from Contractor that Contractor considers the entire Work ready for its intended use, in company with Owner and Contractor, conduct an inspection to determine if the Work is substantially complete. If after considering any objections of Owner,

Page 4 of 7 Pages
(Exhibit "A" to ___) ENGINEER's Services)
Case: 24CI2:15-cv-00177-CLS    Document #: 1-4    Filed: 12/04/2015    Page 6 of 27

Engineer considers the Work substantially complete, Engineer shall deliver a certificate of Substantial Completion to Owner and Contractor.

18. *Additional Tasks.*   Perform or provide the following additional Construction Phase tasks or deliverables:

    a.   Prepare and furnish to the Owner, the Record Drawings showing appropriate record information based on project annotated record documents.

    b.   Prepare and furnish to the Owner, the Operation and Maintenance manuals.

    c.   Provide Construction Phase Services for two prime contracts.

19. *Final Notice of Acceptability of the Work.*   Conduct a final inspection to determine if the completed Work of Contractor is acceptable so that Engineer may recommend, in writing, final payment to Contractor. Accompanying the recommendation for final payment, Engineer shall also provide a notice in the form attached hereto as Exhibit L (the "Notice of Acceptability of Work") that the Work is acceptable (subject to the provisions of Paragraph A1.4.A.15.b) to the best of Engineer's knowledge, information, and belief and based on the extent of the services provided by Engineer under this Agreement.

20. *Duration of Construction Phase.*   The Construction Phase will commence with the execution of the first construction Contract for the Project or any part thereof and will terminate upon written recommendation by Engineer for final payment to Contractors. If the Project involves more than one prime contract as indicated in Paragraph A1.3.A, Construction Phase services may be rendered at different times in respect to the separate contracts. Engineer shall be entitled to an equitable increase in compensation if Construction-Phase services are required after the original date for final completion of the Work as set forth in the construction Contract.

21. *Limitation of Responsibilities.*   Engineer shall not be responsible for the acts or omissions of any Contractor, or of any subcontractors, suppliers, or other individuals or entities performing or furnishing any of the Work. Engineer shall not be responsible for the failure of any Contractor to perform or furnish the Work in accordance with the Contract Documents.

A1.5  *Post-Construction Phase*

  A.  Upon written authorization from Owner, Engineer, during the Post-Construction Phase, shall:

    1.   Provide assistance in connection with the adjusting of Project equipment and systems.

    2.   Assist Owner in training Owner's staff to operate and maintain Project equipment and systems.

    3.   Assist Owner in developing procedures for control of the operation and maintenance of, and record keeping for Project equipment and systems.

    4.   Together with Owner, visit the Project to observe any apparent defects in the Work, assist Owner in consultations and discussions with Contractor concerning correction of any such defects, and make recommendations as to replacement or correction of Defective Work, if present.

    5.   Perform or provide the following additional Post-Construction Phase tasks or deliverables: *None at this time.*

6. In company with Owner or Owner's representative, provide an inspection of the Project within one month before the end of the Correction Period to ascertain whether any portion of the Work is subject to correction.

B. The Post-Construction Phase services may commence during the Construction Phase and, if not otherwise modified in this Exhibit H, will terminate at the end of the Construction Contract's correction period.

## PART 2 — ADDITIONAL SERVICES

A2.01 *Additional Services Requiring OWNER's Authorization*

ALL PROVISIONS OF THIS SECTION INCLUDED IN ORIGINAL AGREEMENT TO REMAIN except that the following additional services are hereby added:

A. Services attributed to more than one prime construction contract as specified in paragraph A1.3.A.

B. Services required as a result of Owner providing incomplete or incorrect Project information to Engineer.

C. Determining the acceptability of substitute materials and equipment proposed during the Bidding or Negotiating Phase when substitution prior to the award of contracts is allowed by the Bidding Documents.

D. Assistance in connection with Bid protests, rebidding, or renegotiating contracts for construction, materials, equipment, or services.

E. Providing construction surveys and staking to enable Contractor to perform its work other than as required under paragraph A1.4 A6, and any type of property surveys or related engineering services needed for the transfer of interests in real property; and providing other special field surveys.

F. Providing Construction Phase services beyond the original date for final completion of the Work.

G. Providing assistance in responding to the presence of any Constituent of Concern at the Site, in compliance with current Laws and Regulations.

H. Preparing and furnishing to Owner Record Drawings showing appropriate record information based on Project annotated record documents received from Contractor.

I. Preparation of operation and maintenance manuals.

J. Providing more extensive services required to enable Engineer to issue notices or certifications requested by Owner.

K. Preparing for, coordinating with, participating in and responding to structured independent review processes, including, but not limited to, construction management, cost estimating, project peer review, value engineering, and constructibility review requested by Owner; and performing or furnishing services required to revise studies, reports, Drawings, Specifications, or other Bidding Documents as a result of such review processes.

L.  Other services performed or furnished by Engineer not otherwise provided for in this Agreement.

**A2.02**  *Additional Services Not Requiring Owner's Written Authorization*

A.  Engineer shall advise Owner that Engineer is commencing to perform or furnish the Additional Services of the types listed below.  For such Additional Services, Engineer need not request or obtain specific advance written authorization from Owner.  Engineer shall cease performing or furnishing such Additional Services upon receipt of written notice from Owner.

1.   Services in connection with Work Change Directives and Change Orders to reflect changes requested by Owner.

2.   Services in making revisions to Drawings and Specifications occasioned by the acceptance of substitute materials or equipment other than "or-equal" items; and services after the award of the Construction Contract in evaluating and determining the acceptability of a substitution which is found to be inappropriate for the Project or an excessive number of substitutions.

3.   Services resulting from significant delays, changes, or price increases occurring as a direct or indirect result of materials, equipment, or energy shortages.

4.   Additional or extended services during construction made necessary by (1) emergencies or acts of God endangering the Work, (2) the presence at the Site of any Constituent of Concern, (3) Work damaged by fire or other cause during construction, (4) a significant amount of defective, neglected, or delayed work by Contractor, (5) acceleration of the progress schedule involving services beyond normal working hours, or (6) default by Contractor.

5.   Services (other than Basic Services during the Post-Construction Phase) in connection with any partial utilization of any part of the Work by Owner prior to Substantial Completion.

6.   Evaluating an unreasonable claim or an excessive number of claims submitted by Contractor or others in connection with the Work.

7.   Services during the Construction Phase rendered after the date stated in A1.4.A20.

This is **EXHIBIT K**, consisting of 1 page, referred to in and part of the **Agreement between Owner and Engineer for Professional Services** dated May 1 , 2008.

Owner's Responsibilities

## SECTION 3 – OWNER'S RESPONSIBILITIES, add the following:

3.8. Authorize Engineer to provide Additional Services as set forth in Part 2 of Exhibit J of the Agreement as required.

3.9. If Owner designates a construction manager or an individual or entity other than, or in addition to, Engineer to represent Owner at the Site, define and set forth as an attachment to this Exhibit I the duties, responsibilities, and limitations of authority of such other party and the relation thereof to the duties, responsibilities, and authority of Engineer.

EJCDC E-500 Standard Form of Agreement Between Owner and Engineer for Professional Services.
Copyright ©2002 National Society of Professional Engineers for EJCDC. All rights reserved.

EJCDC E-500 Standard Form of Agreement Between Owner and Engineer for Professional Services.
Copyright ©2002 National Society of Professional Engineers for EJCDC. All rights reserved.

This is **EXHIBIT L**, consisting of 4 pages, referred to in and part of the **Agreement between Owner and Engineer for Professional Services** dated May 1, 2008 .

## Payments to Engineer for Services and Reimbursable Expenses

Section 5 and Exhibit D of the Agreement is amended and supplemented to include the following agreement of the parties:

Add the following to Exhibit D:

Section 1.1.2

Compensation For Basic Services (other than Resident Project Representative and Post-Construction) -- Lump Sum Method of Payment

    A. Owner shall pay Engineer for Basic Services set forth in Exhibit J, except for services of Engineer's Resident Project Representative and Post-Construction Phase services, if any, as follows:

        1.    A Lump Sum amount of $45,360.00 based on the following assumed distribution of compensation:

            a. Bidding and Construction Administration Phase    $ 45,360.00

        2.    Engineer may alter the distribution of compensation between individual phases noted herein to be consistent with services actually rendered, but shall not exceed the total Lump Sum amount unless approved in writing by the Owner.

        3.    The Lump Sum includes compensation for Engineer's services and services of Engineer's Consultants, if any.  Appropriate amounts have been incorporated in the Lump Sum to account for labor, overhead, profit, and Reimbursable Expenses.

        4.    The portion of the Lump Sum amount billed for Engineer's services will be based upon Engineer's estimate of the proportion of the total services actually completed during the billing period to the Lump Sum.

1.1.3    Compensation For Resident Project Representative and Post-Construction Basic Services  -- Standard Hourly Rates Method of Payment

A. Owner shall pay Engineer for Resident Project Representative and Post-Construction Basic Services as follows:

1.    *Resident Project Representative Services.*    For services of Engineer's Resident Project Representative, if any, under paragraph A1.4.2 of Exhibit H, an amount equal to the cumulative hours charged to the Project by each class of Engineer's employees times Standard Hourly Rates for each applicable billing class for all Resident Project Representative services performed on the Project, plus related Reimbursable Expenses and Engineer's Consultant's charges, if any.  The total compensation under this paragraph is estimated to be $80,546.00 based upon Contract Times as set forth herein. (See Back-Up Sheet No. 1)

2.    *Post-Construction Phase Services.* For Post-Construction Phase services under paragraph A1.5 of Exhibit H, an amount equal to the cumulative hours charged to the Project by each class of Engineer's employees times Standard Hourly Rates for each applicable billing class for all services performed on the Project, plus related Reimbursable Expenses and Engineer's Consultant's charges, if any.  The total compensation under this paragraph is estimated to be $2,855.00. (See Back-Up Sheet No. 2)

B.    Compensation For Reimbursable Expenses

1.    For those Reimbursable Expenses that are not accounted for in the compensation for Basic Services under paragraph 1.1.2, and are directly related to the provision of Resident Project Representative or Post-Construction Basic Services, Owner shall pay Engineer at the rates set forth in Appendix 1 to this Exhibit J.

2.    Reimbursable Expenses include the following categories:  transportation and subsistence incidental thereto; obtaining bids or proposals from Contractor(s); providing and maintaining field office facilities including furnishings and utilities; subsistence and transportation of Resident Project Representative and assistants; toll telephone calls and mobile phone charges; reproduction of reports, Drawings, Specifications, Bidding Documents, and similar Project-related items in addition to those required under Exhibit H, and, if authorized in advance by Owner, overtime work requiring higher than regular rates.  In addition, if authorized in advance by Owner, Reimbursable Expenses will also include expenses incurred for computer time and the use of other highly specialized equipment.

3.    The amounts payable to Engineer for Reimbursable Expenses, if any, will be those internal expenses related to the Resident Project Representative or Post-Construction Basic Services that are actually incurred or allocated by Engineer, plus all invoiced external Reimbursable Expenses allocable to such services, the latter multiplied by a factor of 1.10.

4.    The Reimbursable Expenses Schedule will be adjusted annually (as of January 1) to reflect equitable changes in the compensation payable to Engineer.

C.    Other Provisions Concerning Payment Under this Paragraph 1.1.3

1.    Whenever Engineer is entitled to compensation for the charges of Engineer's Consultants, those charges shall be the amounts billed by Engineer's Consultants to Engineer times a factor of 1.10

2.    Factors.    The external Reimbursable Expenses and Engineer's Consultant's factors include Engineer's overhead and profit associated with Engineer's responsibility for the administration of such services and costs.

3.    Estimated Compensation Amounts

a.    Engineer's estimate of the amounts that will become payable for specified services are only estimates for planning purposes, are not binding on the parties, and are not the minimum or maximum amounts payable to Engineer under the Agreement.

b.    When estimated compensation amounts have been stated herein and it subsequently becomes apparent to Engineer that a compensation amount thus estimated will be exceeded, Engineer shall give Owner written notice thereof. Promptly thereafter Owner and Engineer shall review the matter of services remaining to be performed and compensation for such services. Owner shall either agree to such compensation exceeding said estimated amount or Owner and Engineer shall agree to a reduction in the remaining services to be rendered by Engineer, so that total compensation for such services will not exceed said estimated amount when such services are completed. If Engineer exceeds the estimated amount before Owner and Engineer have agreed to an increase in the compensation due Engineer or a reduction in the remaining services, the Engineer shall be paid for all services rendered hereunder.

4.    To the extent necessary to verify Engineer's charges and upon Owner's timely request, Engineer shall make copies of such records available to Owner at cost.

1.1.4 Compensation For Additional Services – Standard Hourly Rates Method of Payment

A.    Owner shall pay Engineer for Additional Services, if any, as follows:

1.    *General.*  For services of Engineer's employees engaged directly on the Project pursuant to paragraph A2.01 or A2.02 of Exhibit H, except for services as a consultant or witness under section 2.1.2 under original agreement dated May 1, 2008, an amount equal to the cumulative hours charged to the Project by each class of Engineer's employees times Standard Hourly Rates for each applicable billing class for all Additional Services performed on the Project, plus related Reimbursable Expenses and Engineer's Consultant's charges, if any.

B.    Compensation For Reimbursable Expenses

1.    For those Reimbursable Expenses that are not accounted for in the compensation for Basic Services under Section 1.1.2 of Exhibit D and are directly related to the provision of Additional Services, Owner shall pay Engineer at the rates set forth in Appendix 1 to this Exhibit J.

2.    Reimbursable Expenses include the following categories: transportation and subsistence incidental thereto; obtaining bids or proposals from Contractor(s); providing and maintaining field office facilities including furnishings and utilities; toll telephone calls and mobile phone charges; reproduction of reports, Drawings, Specifications, Bidding Documents, and similar Project-related items in addition to those required under Exhibit H, and, if authorized in advance by Owner, overtime work requiring higher than regular rates. In addition, if authorized in advance by Owner, Reimbursable Expenses will also include expenses incurred for computer time and the use of other highly specialized equipment.

3.    The amounts payable to Engineer for Reimbursable Expenses, if any, will be the Additional Services-related internal expenses actually incurred or allocated by Engineer, plus all invoiced external Reimbursable Expenses allocable to such Additional Services, the latter multiplied by a factor of 1.10.

4.    The Reimbursable Expenses Schedule will be adjusted annually (as of January 1) to reflect equitable changes in the compensation payable to Engineer.

C.    Other Provisions Concerning Payment For Additional Services

1.    Whenever Engineer is entitled to compensation for the charges of Engineer's Consultants, those charges shall be the amounts billed by Engineer's Consultants to Engineer times a factor of 1.10.

2.    Factors.    The external Reimbursable Expenses and Engineer's Consultant's Factors include Engineer's overhead and profit associated with Engineer's responsibility for the administration of such services and costs.

3.    To the extent necessary to verify Engineer's charges and upon Owner's timely request, Engineer shall make copies of such records available to Owner at cost.

D.    Owner shall pay Engineer for Additional Construction Phase Tasks pursuant to paragraph A1.4.A18 and A2.01, H of Exhibit J as follows:  For preparation of record drawings, an estimated fee of $7,239.00.  See Back-up Sheet No. 3.

Case: 24CI2:15-cv-00410-JNK   Document #: 1-23   Filed: 07/72/2015   Page 15 of 27

This is **Appendix 1 to EXHIBIT L,** consisting of
<u>1</u> page, referred to in and part of the **Agreement
between Owner and Engineer for Professional
Services** dated <u>May 1</u> , 2008.

## Reimbursable Expenses Schedule

Reimbursable expenses for services performed on the date of the Agreement are:

| | |
|---|---|
| 8½ "x 11" Photo Copies (Black & White) | <u>0.15</u> /page |
| 8½" x 11" Photo Copies (Color) | <u>0.59</u>/page |
| Reproducible Copies (Mylar) | <u>1.25</u>/sq. ft. |
| Reproducible Copies (Paper) | <u>0.06</u>/sq. ft. |
| Mileage (auto) | <u>.585</u>/mile |
| Mobile Phone | <u>65.00</u>/month |
| Meals and Lodging | at cost |
| Parking | at cost |
| Overnight Mail | at cost |
| Contract Printing and Reproduction | at cost |
| Any Specialized Equipment | at cost |

NOTE:  The above Reimbursable Expense Schedule shall be adjusted as required each year on January 1st.

This is **Appendix 2 to EXHIBIT L.** consisting of
<u>1</u> page, referred to in and part of the **Agreement
between Owner and Engineer for Professional
Services** dated <u>May 1</u>, 2008.

Standard Hourly Rates Schedule

A. Standard Hourly Rates

    1.    Standard Hourly Rates are set forth in this Appendix 2 to this Exhibit J and include salaries and wages paid to personnel in each billing class plus the cost of customary and statutory benefits, general and administrative overhead, non-project operating costs, and operating margin or profit.

    2.    The Standard Hourly Rates will be adjusted annually (as of <u>January 1</u>) to reflect equitable changes in the compensation payable to Engineer.

    3.    The Standard Hourly Rates apply only as specified in Articles 1.1.3 and 1.1.4 in Exhibit J.

B. Schedule of Hourly Rates as of October 15, 2008.

| | |
|---|---|
| Principal (Capped) | $   225.00/Hr. |
| Sr. Project Manager | $   195.00/Hr. |
| Civil/Structural Engineer | $   150.00/Hr. |
| Sr. Civil engineering Designer/Technician | $   110.00/Hr. |
| Resident Project Representative | $    75.00/Hr. |
| CADD Technician | $    70.00/Hr. |
| Clerical/Word Processor | $    55.00/Hr. |
| Electrical Engineer (Consultant) | $   140.00/Hr. |
| Electrical Engineering Intern (Consultant) | $   105.00/Hr. |
| Electrical Designer (Consultant) | $    75.00/Hr. |
| Geotechnical Consultant | At Cost |
| Survey Crew (Consultant) | At Cost |

Hourly Rates shown for non-exempt employees are for regular time. Overtime rates shall be calculated by multiplying the salary rate by 1.50 and adding in fringe benefits at regular time.

This is **EXHIBIT M**, consisting of 4 pages, referred to in and part of the **Agreement between Owner and Engineer for Professional Services** dated May, 1, 2008.

Duties, Responsibilities, and Limitations of Authority of Resident Project Representative

Paragraph 1.01.A of the Agreement is amended and supplemented to include the following agreement of the parties:

D1.01    Resident Project Representative

A. Engineer shall furnish a Resident Project Representative ("RPR"), assistants, and other field staff to assist Engineer in observing progress and quality of the Work. The RPR, assistants, and other field staff under this Exhibit D may provide full time representation or may provide representation to a lesser degree.

B. Through such additional observations of Contractor's work in progress and field checks of materials and equipment by the RPR and assistants, Engineer shall endeavor to provide further protection for Owner against defects and deficiencies in the Work. However, Engineer shall not, during such visits or as a result of such observations of Contractor's work in progress, supervise, direct, or have control over the Contractor's Work nor shall Engineer have authority over or responsibility for the means, methods, techniques, sequences, or procedures selected or used by Contractor, for security or safety at the Site, for safety precautions and programs incident to the Contractor's work in progress, for any failure of Contractor to comply with Laws and Regulations applicable to Contractor's performing and furnishing the Work, or responsibility of construction for Contractor's failure to furnish and perform the Work in accordance with the Contract Documents. In addition, the specific terms set forth in section A.1.05 of Exhibit A of the Agreement are applicable.

C. The duties and responsibilities of the RPR are as follows:

1.    *General:* RPR is Engineer's agent at the Site, will act as directed by and under the supervision of Engineer, and will confer with Engineer regarding RPR's actions. RPR's dealings in matters pertaining to the Contractor's work in progress shall in general be with Engineer and Contractor, keeping Owner advised as necessary. RPR's dealings with subcontractors shall only be through or with the full knowledge and approval of Contractor. RPR shall generally communicate with Owner with the knowledge of and under the direction of Engineer.

2.    *Schedules:* Review the progress schedule, schedule of Shop Drawing and Sample submittals, and schedule of values prepared by Contractor and consult with Engineer concerning acceptability.

3.    *Conferences and Meetings:* Attend meetings with Contractor, such as preconstruction conferences, progress meetings, job conferences and other project-related meetings, and prepare and circulate copies of minutes thereof.

4.    *Liaison:*

a.    Serve as Engineer's liaison with Contractor, working principally through Contractor's superintendent, assist in providing information regarding the intent of the Contract Documents.

b.    Assist Engineer in serving as Owner's liaison with Contractor when Contractor's operations affect Owner's on-Site operations.

EJCDC E-500 Standard Form of Agreement Between Owner and Engineer for Professional Services.
Copyright ©2002 National Society of Professional Engineers for EJCDC. All rights reserved.

     c.    Assist in obtaining from Owner additional details or information, when required for proper execution of the Work.

    5.   *Interpretation of Contract Documents:*  Report to Engineer when clarifications and interpretations of the Contract Documents are needed and transmit to Contractor clarifications and interpretations as issued by Engineer.

    6.   *Shop Drawings and Samples*:

     a.    Record date of receipt of Samples and approved Shop Drawings.

     b.    Receive Samples which are furnished at the Site by Contractor, and notify Engineer of availability of Samples for examination.

     c.    Advise Engineer and Contractor of the commencement of any portion of the Work requiring a Shop Drawing or Sample submittal for which RPR believes that the submittal has not been approved by Engineer.

    7.   *Modifications:*  Consider and evaluate Contractor's suggestions for modifications in Drawings or Specifications and report such suggestions, together with RPR's recommendations, to Engineer.  Transmit to Contractor in writing decisions as issued by Engineer.

    8.   *Review of Work and Rejection of Defective Work*:

     a.    Conduct on-Site observations of Contractor's work in progress to assist Engineer in determining if the Work is in general proceeding in accordance with the Contract Documents.

     b.    Report to Engineer whenever RPR believes that any part of Contractor's work in progress will not produce a completed Project that conforms generally to the Contract Documents or will imperil the integrity of the design concept of the completed Project as a functioning whole as indicated in the Contract Documents, or has been damaged, or does not meet the requirements of any inspection, test or approval required to be made; and advise Engineer of that part of work in progress that RPR believes should be corrected or rejected or should be uncovered for observation, or requires special testing, inspection or approval.

    9.   *Inspections, Tests, and System Startups*:

     a.    Consult with Engineer in advance of scheduled major inspections, tests, and systems startups of important phases of the Work.

     b.    Verify that tests, equipment, and systems start-ups and operating and maintenance training are conducted in the presence of appropriate Owner's personnel, and that Contractor maintains adequate records thereof.

     c.    Observe, record, and report to Engineer appropriate details relative to the test procedures and systems start-ups.

     d.    Accompany visiting inspectors representing public or other agencies having jurisdiction over the Project, record the results of these inspections, and report to Engineer.

10. *Records*:

    a.    Maintain at the Site orderly files for correspondence, reports of job conferences, reproductions of original Contract Documents including all Change Orders, Field Orders, Work Change Directives, Addenda, additional Drawings issued subsequent to the execution of the Contract, Engineer's clarifications and interpretations of the Contract Documents, progress reports, Shop Drawing and Sample submittals received from and delivered to Contractor, and other Project-related documents.

    b.    Prepare a daily report or keep a diary or log book, recording Contractor's hours on the Site, weather conditions, data relative to questions of Change Orders, Field Orders, Work Change Directives, or changed conditions, Site visitors, daily activities, decisions, observations in general, and specific observations in more detail as in the case of observing test procedures; and send copies to Engineer.

    c.    Record names, addresses, fax numbers, e-mail addresses, web site locations, and telephone numbers of all Contractors, subcontractors, and major suppliers of materials and equipment.

    d.    Maintain records for use in preparing Project documentation.

    e.    Upon completion of the Work, furnish original set of all RPR Project documentation to Engineer.

11. *Reports*:

    a.    Furnish to Engineer periodic reports as required of progress of the Work and of Contractor's compliance with the progress schedule and schedule of Shop Drawing and Sample submittals.

    b.    Draft and recommend to Engineer proposed Change Orders, Work Change Directives, and Field Orders. Obtain backup material from Contractor.

    c.    Furnish to Engineer and Owner copies of all inspection, test, and system start-up reports.

    d.    Immediately notify Engineer of the occurrence of any Site accidents, emergencies, acts of God endangering the Work, damage to property by fire or other causes, or the discovery of any Constituent of Concern. .

12. *Payment Requests*:  Review Applications for Payment with Contractor for compliance with the established procedure for their submission and forward with recommendations to Engineer, noting particularly the relationship of the payment requested to the schedule of values, Work completed, and materials and equipment delivered at the Site but not incorporated in the Work.

13. *Certificates, Operation and Maintenance Manuals*:  During the course of the Work, verify that materials and equipment certificates, operation and maintenance manuals and other data required by the Specifications to be assembled and furnished by Contractor are applicable to the items actually installed and in accordance with the Contract Documents, and have these documents delivered to Engineer for review and forwarding to Owner prior to payment for that part of the Work.

14. *Completion*:

    a.    Participate in a Substantial Completion inspection, assist in the determination of Substantial Completion and the preparation of lists of items to be completed or corrected.

      b.   Participate in a final inspection in the company of Engineer, Owner, and Contractor and prepare a final list of items to be completed and deficiencies to be remedied.

      c.   Observe whether all items on the final list have been completed or corrected and make recommendations to Engineer concerning acceptance and issuance of the Notice of Acceptability of the Work.

**D. Resident Project Representative shall not:**

1.   Authorize any deviation from the Contract Documents or substitution of materials or equipment (including "or-equal" items).

2.   Exceed limitations of Engineer's authority as set forth in the Agreement or the Contract Documents.

3.   Undertake any of the responsibilities of Contractor, subcontractors, suppliers, or Contractor's superintendent.

4.   Advise on, issue directions relative to, or assume control over any aspect of the means, methods, techniques, sequences or procedures of Contractor's work unless such advice or directions are specifically required by the Contract Documents.

5.   Advise on, issue directions regarding, or assume control over safety practices, precautions, and programs in connection with the activities or operations of Owner or Contractor.

6.   Participate in specialized field or laboratory tests or inspections conducted off-site by others except as specifically authorized by Engineer.

7.   Accept Shop Drawing or Sample submittals from anyone other than Contractor.

8.   Authorize Owner to occupy the Project in whole or in part.

This is **EXHIBIT N,** consisting of 1 page, referred to in and part of the **Agreement between Owner and Engineer for Professional Services** dated May, 1, 2008.

---

## NOTICE OF ACCEPTABILITY OF WORK

PROJECT:

OWNER:

OWNER'S CONSTRUCTION CONTRACT IDENTIFICATION:

EFFECTIVE DATE OF THE CONSTRUCTION AGREEMENT:

CONSTRUCTION CONTRACT DATE:

ENGINEER:

---

To:

OWNER

And To:

CONTRACTOR

From:

ENGINEER

---

The Engineer hereby gives notice to the above Owner and Contractor that the completed Work furnished and performed by Contractor under the above Contract is acceptable, expressly subject to the provisions of the related Contract Documents, the Agreement between Owner and Engineer for Professional Services dated _____, _____, and the terms and conditions set forth on the reverse side of this Notice.

By: _____

Title: _____

Dated: _____

---

Page 1 of 1 Page
(Exhibit L - Notice of Acceptability of Work)
EJCDC E-500 Standard Form of Agreement Between Owner and Engineer for Professional Services.
Copyright ©2002 National Society of Professional Engineers for EJCDC. All rights reserved.

## BACK-UP SHEET NO. 1

## ESTIMATED COMPENSATION FOR RESIDENT PROJECT REPRESENTATIVE

| | | | |
|---|---|---|---|
| **LABOR:** | 12 Mos X 4.33 wks./mo. X 40 hrs/wk x $75.00/hr | = | $155,880.00 |
| **MILEAGE:** | 12 Mos x 4.33 wk/mo x 6 days/wk x 20 mi/day x $.585/mi | = | $ 3,647.59 |
| **CELL PHONE:** | 12 Mos x $65/mo | = | $ 780.00 |
| **COPIES:** | 12 Mos x 4.33 wks/mo x 6 days/wk x 17 copies/day x $0.148 | = | $ 784.41 |

TOTAL ESTIMATED REIMBURSABLE EXPENSES FOR RPR          $161,092.00

Assume RPR will be shared With Project S21
Since Projects are in Close Proximity                                  + 2
Total Estimated Reimbursable Expense for RPR for Wastewater Project (W19)     $ 80,546.00

*NOTE: 1. It is assumed that combined duration of Water (W19) and Wastewater (S21) projects will not exceed 12 calendar months.*
*2. It has been assumed that Engineer will not be required to establish a field office (trailer).*



ASSOCIATES, INC.
CONSULTING ENGINEERS
AND PLANNERS

**Back-Up Sheet No. 1**

BACK-UP SHEET NO. 2

POST-CONSTRUCTION PHASE SERVICES PURSUANT TO PARAGRAPH A1.5.

| | | | |
|---|---|---|---|
| 8 Civil Engineer Hours | @ $150.00 | = | $ 1,200.00 |
| 4 Sr. Project Manager Hours | @ $195.00 | = | $ 780.00 |
| 4 Electrical Engineer Hours | @ $140.00 x 1.10 | = | $ 616.00 |
| 1 Principal Hour | @ $225.00 | = | $ 225.00 |

TOTAL LABOR      $ 2,821.00

MILEAGE: 50 MILES @ 0.585 = $29.25
COPIES: 30 @ $ .15 = $ 4.50

$ 33.75

TOTAL ESTIMATED COST     $ 2,854.75

USE    $ 2,855.00



NV ASSOCIATES, INC.
CONSULTING ENGINEERS
AND PLANNERS

Back-Up Sheet No. 2

BACK-UP SHEET NO. 3

1.    **PREPARE RECORD DRAWINGS IN ACCORDANCE WITH PARAGRAPH A1.3.A18:**

| | | | |
|---|---|---|---|
| CADD Technician | 70 hrs @ $ 70.00/hr | = | $ 4,900.00 |
| RPR | 8 hrs @ $ 75.00/hr | = | $   600.00 |
| Civil/Structural Engineer | 8 hrs @ $150.00/hr | = | $ 1,200.00 |
| Sr. Project Manager | .5 hr  @ $195.00/hr | = | $     97.50 |
| Electrical Engineer | 2 hrs @ $140.00/hr (1.10) | = | $   308.00 |
| | | | $ 7,105.50 |

Mylars:  18 Sheets x 6 S.F./Sheet x $1.24/S.F.        =        $   133.50

        **ESTIMATED TOTAL COST**                        $ 7,239.00



ASSOCIATES, INC.
CONSULTING ENGINEERS
AND PLANNERS

Back-Up Sheet No. 3

| ❄EPA | **COST OR PRICE SUMMARY**<br>*(see accompanying instructions before completing this form)* | *Form approved*<br>*OMB No. 2030-0011*<br>*Approval expires 10-31-86* |
|---|---|---|

## COST OR PRICE SUMMARY FORMAT FOR SUBAGREEMENTS UNDER U.S. EPA ASSISTANCE

### PART I - GENERAL

| 1. RECIPIENT<br>Harrison County Utility Authority | 2. ASSISTANCE IDENTIFICATION NO.<br>R102-06 |
|---|---|
| 3. NAME OF CONTRACTOR OR SUBCONTRACTOR<br>N-Y Associates, Inc. | 4. DATE OF PROPOSAL<br>September 8, 2008 |
| 5. ADDRESS OF CONTRACTOR OR SUBCONTRACTOR<br><br>178 Main Street<br>Biloxi, MS 39530-3830 | 6. TYPE OF SERVICE TO BE FURNISHED<br>Engineering Services for Biloxi Broadwater Water<br>System Improvements (W-19), Bidding, Construction<br>and Post Construction Phase Services - Amendment No. 3 |

### PART II - COST SUMMARY

| 7. DIRECT LABOR (Specify labor categories) | ESTIMATED HOURS | HOURLY RATE | ESTIMATED COST | TOTALS |
|---|---|---|---|---|
| Principal | 15 | $ 68.56 | $ 1,028.40 | |
| Senior Project Manager | 101 | $ 59.42 | $ 6,001.42 | |
| Civil/Structural Engineer | 500 | $ 45.70 | $ 22,850.00 | |
| Senior Certified Engineering Technician | 90 | $ 33.52 | $ 3,016.80 | |
| Electrical Engineer | 80 | $ 46.92 | $ 3,753.60 | |
| CADD Technician | 108 | $ 21.33 | $ 2,303.64 | |
| Clerical | 84 | $ 16.76 | $ 1,407.84 | |
| Resident Project Representative (RPR) | 1048 | $ 22.85 | $ 23,946.80 | |
| **DIRECT LABOR TOTAL:** | | | | $ 40,361.70 |

| 8. INDIRECT COSTS (Specify indirect cost pools) | RATE | X BASE = | ESTIMATED COST | |
|---|---|---|---|---|
| Direct Labor | 1.9303 | $ 40,361.70 | $ 77,910.19 | |
| **INDIRECT COSTS TOTAL:** | | | | $ 77,910.19 |

| 9. OTHER DIRECT COSTS | | | | |
|---|---|---|---|---|
| a. TRAVEL | Estimated Miles | Mileage Rate | ESTIMATED COST | |
| (1) TRANSPORTATION: Mileage | 3168 | $ 0.585 | $ 1,853.28 | |
| **TRAVEL SUBTOTAL:** | | | $ 1,853.28 | |
| b. EQUIPMENT, MATERIALS, SUPPLIES<br>*(Specify categories)* | QTY | COST | ESTIMATED COST | |
| Mylars ( in sq. ft., 6 sq. ft. per sheet) | 108 | $ 1.24 | $ 133.92 | |
| Photocopies | 2629 | $ 0.148 | $ 389.09 | |
| Cell Phone (Qty. in months) | 12 | $ 65.00 | $ 780.00 | |
| **EQUIPMENT SUBTOTAL:** | | | $ 1,303.01 | |
| c. SUBCONTRACTS | | | ESTIMATED COST | |
| **SUBCONTRACTS SUBTOTAL:** | | | $ - | |
| d. OTHER (Specify categories) | | | ESTIMATED COST | |
| **OTHER SUBTOTAL:** | | | | |
| **OTHER DIRECT COSTS TOTAL:** | | | | $ 3,156.29 |

| 10. TOTAL ESTIMATED COST | $ 121,428.18 |
|---|---|
| 11. PROFIT @ 12% | $ 14,571.38 |
| 12. TOTAL PRICE | $ 136,000.00 |

| PART III - PRICE SUMMARY | | |
|---|---|---|
| 13. COMPETITOR'S CATALOG LISTINGS, IN-HOUSE ESTIMATES, PRIOR QUOTES (Indicate basis for price comparison) | MARKET PRICES(S) | PROPOSED PRICE |
| N/A | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | $  0.00 |

## PART IV - CERTIFICATIONS

**14. CONTRACTOR**

**14a.** HAS A FEDERAL AGENCY OR FEDERALLY CERTIFIED STATE OR LOCAL AGENCY PERFORMED ANY REVIEW OF YOUR ACCOUNTS RECORDS IN CONNECTION WITH ANY OTHER FEDERAL ASSISTANCE AGREEMENT OR CONTRACT WITHIN THE PAST 12 MONTHS

☐ Yes    ☐ No    (If Yes* give name, address, and telephone number of reviewing office)

The rate for indirect costs (Line 8) is the firm's 2007 overhead rate audited to Federal Acquisition Regulations (FAR) by an independent CPA.

**14b.** THIS SUMMARY CONFORMS WITH THE FOLLOWING COST PRINCIPLES

For profit organizations 48 CFR 31.105

**14c.** This proposal is submitted for use in connection with and in response to:

(1) Request for Proposals for Engineering Services for work relating to the Implementation of a CDBG Gulf Regional Recovery Grant for the Biloxi Broadwater Water System Improvements (W-19)

| This is to certify to the best of my knowledge and belief that the cost and pricing data summarized herein are complete, current, and accurate as of: | (2) DATE 6/24/09 |
|---|---|

I further certify that a financial management capability exists to fully accurately account for the financial transactions under this project. I further certify that I understand that the subagreement price may be subject to downward renegotiation and/or recoupment where the above cost and pricing data have been determined, as a result of audit, not to have been complete, current, and accurate as of the date above.

| (3) TITLE OF PROPOSER | SIGNATURE OF PROPOSER | DATE OF EXECUTION |
|---|---|---|
| Vice-President | Constantine F. Nicoladis, PE | 9/10/09 |

**15. RECIPIENT REVIEWER**

I certify that I have reviewed the cost/price summary set forth herein and the proposed cost/price appear acceptable for subagreement award.

| TITLE OF REVIEWER | SIGNATURE OF REVIEWER | DATE OF EXECUTION |
|---|---|---|
| Exec. Director | | 10/7/09 |

**16. EPA REVIEWER**

| TITLE OF REVIEWER | SIGNATURE OF REVIEWER | DATE OF EXECUTION |
|---|---|---|
| | | |